(Slip Opinion) OCTOBER TERM, 2019 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## DEPARTMENT OF HOMELAND SECURITY ET AL. *v.* THURAISSIGIAM

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 19–161. Argued March 2, 2020—Decided June 25, 2020

The Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) provides for the expedited removal of certain "applicants" seeking admission into the United States, whether at a designated port of entry or elsewhere. 8 U. S. C. §1225(a)(1). An applicant may avoid expedited removal by demonstrating to an asylum officer a "credible fear of persecution," defined as "a significant possibility . . . that the alien could establish eligibility for asylum." §1225(b)(1)(B)(v). An applicant who makes this showing is entitled to "full consideration" of an asylum claim in a standard removal hearing. 8 CFR §208.30(f). An asylum officer's rejection of a credible-fear claim is reviewed by a supervisor and may then be appealed to an immigration judge. §§208.30(e)(8), 1003.42(c), (d)(1). But IIRIRA limits the review that a federal court may conduct on a petition for a writ of habeas corpus. 8 U. S. C. §1252(e)(2). In particular, courts may not review "the determination" that an applicant lacks a credible fear of persecution. §1252(a)(2)(A)(iii).

Respondent Vijayakumar Thuraissigiam is a Sri Lankan national who was stopped just 25 yards after crossing the southern border without inspection or an entry document. He was detained for expedited removal. An asylum officer rejected his credible-fear claim, a supervising officer agreed, and an Immigration Judge affirmed. Respondent then filed a federal habeas petition, asserting for the first time a fear of persecution based on his Tamil ethnicity and political views and requesting a new opportunity to apply for asylum. The District Court dismissed the petition, but the Ninth Circuit reversed, holding that, as applied here, §1252(e)(2) violates the Suspension Clause and the Due Process Clause.

*Held*:

 1. As applied here, §1252(e)(2) does not violate the Suspension Clause.  Pp. 11–33.

 (a) The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."  Art. I, §9, cl. 2.  This Court has held that, at a minimum, the Clause "protects the writ as it existed in 1789," when the Constitution was adopted. *INS* v. *St. Cyr*, 533 U. S. 289, 301.  Habeas has traditionally provided a means to seek release from unlawful detention.  Respondent does not seek release from custody, but an additional opportunity to obtain asylum.  His claims therefore fall outside the scope of the writ as it existed when the Constitution was adopted.  Pp. 11–15.

 (b) Respondent contends that three bodies of case law support his argument that the Suspension Clause guarantees a broader habeas right, but none do.  Pp. 15–33.

 (1) Respondent first points to British and American cases decided before or around the Constitution's adoption.  All those cases show is that habeas was used to seek release from detention in a variety of circumstances.  Respondent argues that some cases show aliens using habeas to remain in a country.  But the relief ordered in those cases was simply release; an alien petitioner's ability to remain in the country was due to immigration law, or lack thereof.  The relief that a habeas court may order and the collateral consequences of that relief are two entirely different things.  Pp. 15–23.

 (2) Although respondent claims to rely on the writ as it existed in 1789, his argument focuses on this Court's decisions during the "finality era," which takes its name from a feature of the Immigration Act of 1891 making certain immigration decisions "final."  In *Nishimura Ekiu* v. *United States*, 142 U. S. 651, the Court interpreted the Act to preclude judicial review only of questions of fact.  Federal courts otherwise retained authority under the Habeas Corpus Act of 1867 to determine whether an alien was detained in violation of federal law. Thus, when aliens sought habeas relief during the finality era, the Court exercised habeas jurisdiction that was conferred by the habeas statute, not because it was required by the Suspension Clause—which the Court did not mention.  Pp. 23–32.

 (3) The Court's more recent decisions in *Boumediene* v. *Bush*, 553 U. S. 723, and *St. Cyr*, 533 U. S. 289, also do not support respondent's argument.  *Boumediene* was not about immigration at all, and *St. Cyr* reaffirmed that the common-law habeas writ provided a vehicle to challenge detention and could be invoked by aliens already in the country who were held in custody pending deportation.  It did not approve respondent's very different attempted use of the writ.  Pp. 32–33.

Syllabus

2. As applied here, §1252(e)(2) does not violate the Due Process Clause. More than a century of precedent establishes that, for aliens seeking initial entry, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu*, 142 U. S., at 660. Respondent argues that this rule does not apply to him because he succeeded in making it 25 yards into U. S. territory. But the rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U. S. soil. An alien who is detained shortly after unlawful entry cannot be said to have "effected an entry." *Zadvydas* v. *Davis*, 533 U. S. 678, 693. An alien in respondent's position, therefore, has only those rights regarding admission that Congress has provided by statute. In respondent's case, Congress provided the right to a "determin[ation]" whether he had "a significant possibility" of "establish[ing] eligibility for asylum," and he was given that right. §§1225(b)(1)(B)(ii), (v). Pp. 34–36.

917 F. 3d 1097, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, and KAVANAUGH, JJ., joined. THOMAS, J., filed a concurring opinion. BREYER, J., filed an opinion concurring in the judgment, in which GINSBURG, J., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KAGAN, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 19–161

## DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* VIJAYAKUMAR THURAISSIGIAM

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

### [June 25, 2020]

JUSTICE ALITO delivered the opinion of the Court.

Every year, hundreds of thousands of aliens are apprehended at or near the border attempting to enter this country illegally. Many ask for asylum, claiming that they would be persecuted if returned to their home countries. Some of these claims are valid, and by granting asylum, the United States lives up to its ideals and its treaty obligations. Most asylum claims, however, ultimately fail, and some are fraudulent. In 1996, when Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), 110 Stat. 3009–546, it crafted a system for weeding out patently meritless claims and expeditiously removing the aliens making such claims from the country. It was Congress's judgment that detaining all asylum seekers until the full-blown removal process is completed would place an unacceptable burden on our immigration system and that releasing them would present an undue risk that they would fail to appear for removal proceedings.

This case concerns the constitutionality of the system

Congress devised.  Among other things, IIRIRA placed re-
strictions on the ability of asylum seekers to obtain review
under the federal habeas statute, but the United States
Court of Appeals for the Ninth Circuit held that these re-
strictions are unconstitutional.  According to the Ninth Cir-
cuit, they unconstitutionally suspend the writ of habeas
corpus and violate asylum seekers' right to due process.  We
now review that decision and reverse.

Respondent's Suspension Clause argument fails because
it would extend the writ of habeas corpus far beyond its
scope "when the Constitution was drafted and ratified."
*Boumediene* v. *Bush*, 553 U. S. 723, 746 (2008).  Indeed, re-
spondent's use of the writ would have been unrecognizable
at that time.  Habeas has traditionally been a means to se-
cure *release* from unlawful detention, but respondent in-
vokes the writ to achieve an entirely different end, namely,
to obtain additional administrative review of his asylum
claim and ultimately to obtain authorization to stay in this
country.

Respondent's due process argument fares no better.
While aliens who have established connections in this coun-
try have due process rights in deportation proceedings, the
Court long ago held that Congress is entitled to set the con-
ditions for an alien's lawful entry into this country and that,
as a result, an alien at the threshold of initial entry cannot
claim any greater rights under the Due Process Clause.  See
*Nishimura Ekiu* v. *United States*, 142 U. S. 651, 660 (1892).
Respondent attempted to enter the country illegally and
was apprehended just 25 yards from the border.  He there-
fore has no entitlement to procedural rights other than
those afforded by statute.

In short, under our precedents, neither the Suspension
Clause nor the Due Process Clause of the Fifth Amendment
requires any further review of respondent's claims, and
IIRIRA's limitations on habeas review are constitutional as
applied.

# I
## A

We begin by briefly outlining the provisions of immigration law that are pertinent to this case. Under those provisions, several classes of aliens are "inadmissible" and therefore "removable." 8 U. S. C. §§1182, 1229a(e)(2)(A). These include aliens who lack a valid entry document "at the time of application for admission." §1182(a)(7)(A)(i)(I). An alien who arrives at a "port of entry," *i.e.*, a place where an alien may lawfully enter, must apply for admission. An alien like respondent who is caught trying to enter at some other spot is treated the same way. §§1225(a)(1), (3).

If an alien is inadmissible, the alien may be removed. The usual removal process involves an evidentiary hearing before an immigration judge, and at that hearing an alien may attempt to show that he or she should not be removed. Among other things, an alien may apply for asylum on the ground that he or she would be persecuted if returned to his or her home country. §1229a(b)(4); 8 CFR §1240.11(c) (2020). If that claim is rejected and the alien is ordered removed, the alien can appeal the removal order to the Board of Immigration Appeals and, if that appeal is unsuccessful, the alien is generally entitled to review in a federal court of appeals. 8 U. S. C. §§1229a(c)(5), 1252(a). As of the first quarter of this fiscal year, there were 1,066,563 pending removal proceedings. See Executive Office for Immigration Review (EOIR), Adjudication Statistics: Pending Cases (Jan. 2020). The average civil appeal takes approximately one year.[1] During the time when removal is being litigated, the alien will either be detained, at considerable expense, or allowed to reside in this country, with the attendant risk

---

[1] See Administrative Office of the U. S. Courts, Federal Judicial Caseload Statistics, U. S. Courts of Appeals—Median Time Intervals in Months for Civil and Criminal Appeals Terminated on the Merits (2019) (Table B–4A) (time calculated for non-prisoner appeals from the filing of a notice of appeal to the last opinion or final order).

that he or she may not later be found. §1226(a).

Congress addressed these problems by providing more expedited procedures for certain "applicants for admission." For these purposes, "[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival . . . )" is deemed "an applicant for admission." §1225(a)(1).[2] An applicant is subject to expedited removal if, as relevant here, the applicant (1) is inadmissible because he or she lacks a valid entry document; (2) has not "been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility"; and (3) is among those whom the Secretary of Homeland Security has designated for expedited removal. §§1225(b)(1)(A)(i), (iii)(I)–(II).[3] Once "an immigration officer determines" that a designated applicant "is inadmissible," "the officer [must] order the alien removed from the United States without further hearing or review." §1225(b)(1)(A)(i).

Applicants can avoid expedited removal by claiming asylum. If an applicant "indicates either an intention to apply for asylum" or "a fear of persecution," the immigration officer "shall refer the alien for an interview by an asylum officer." §§1225(b)(1)(A)(i)–(ii). The point of this screening interview is to determine whether the applicant has a "credible fear of persecution." §1225(b)(1)(B)(v). The applicant need not show that he or she *is in fact eligible* for asylum— a "credible fear" equates to only a "significant possibility"

---

[2] When respondent entered the country, aliens were treated as applicants for admission if they were "encountered within 14 days of entry without inspection and within 100 air miles of any U. S. international land border." 69 Fed. Reg. 48879 (2004).

[3] This authority once belonged to the Attorney General, who is still named in the statute. See 6 U. S. C. §251(2) (transferring authority over "[t]he detention and removal program" to the Department).

that the alien would be eligible. *Ibid.* Thus, while eligibility ultimately requires a "well-founded fear of persecution on account of," among other things, "race" or "political opinion," §§1101(a)(42)(A), 1158(b)(1)(A), all that an alien must show to avoid expedited removal is a "credible fear."[4]

If the asylum officer finds an applicant's asserted fear to be credible,[5] the applicant will receive "full consideration" of his asylum claim in a standard removal hearing. 8 CFR §208.30(f); see 8 U. S. C. §1225(b)(1)(B)(ii). If the asylum officer finds that the applicant does not have a credible fear, a supervisor will review the asylum officer's determination. 8 CFR §208.30(e)(8). If the supervisor agrees with it, the applicant may appeal to an immigration judge, who can take further evidence and "shall make a de novo determination." §§1003.42(c), (d)(1); see 8 U. S. C. §1225(b)(1)(B)(iii)(III).

An alien subject to expedited removal thus has an opportunity at three levels to obtain an asylum hearing, and the

––––––––––

[4] A grant of asylum enables an alien to enter the country, but even if an applicant qualifies, an actual grant of asylum is discretionary. §1158(b)(1)(A).

[5] The asylum officer also considers an alien's potential eligibility for withholding of removal under §1231(b)(3) or relief under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). 8 CFR §§208.30(e)(2)–(3). Respondent's habeas petition alleges that "he can show a significan[t] possibility that he could establish eligibility for asylum, withholding of removal, and CAT claims." App. 31–32. But he says in his petition that he left Sri Lanka "to seek asylum in the United States." *Id.*, at 15. He discusses the criteria only for asylum. *Id.*, at 21; see also Brief for Respondent 4. And he now alleges that he was improperly "denied asylum." *Id.*, at 5. Moreover, the gravamen of his petition is that he faces persecution in Sri Lanka "because of" his Tamil ethnicity and political opinions. App. 13. To obtain withholding or CAT relief on that basis, he would need to show "a greater likelihood of persecution or torture at home than is necessary for asylum." *Moncrieffe* v. *Holder*, 569 U. S. 184, 187, n. 1 (2013). And he would not avoid removal, only removal to Sri Lanka. 8 U. S. C. §1231(b)(3)(A); 8 CFR §208.16(f). We therefore read his petition as it is plainly intended: to seek another opportunity to apply for asylum.

applicant will obtain one unless the asylum officer, a super-
visor, and an immigration judge all find that the applicant
has not asserted a credible fear.

Over the last five years, nearly 77% of screenings have
resulted in a finding of credible fear.[6]  And nearly half the
remainder (11% of the total number of screenings) were
closed for administrative reasons, including the alien's
withdrawal of the claim.[7]  As a practical matter, then, the
great majority of asylum seekers who fall within the cate-
gory subject to expedited removal do not receive expedited
removal and are instead afforded the same procedural
rights as other aliens.

Whether an applicant who raises an asylum claim re-
ceives full or only expedited review, the applicant is not en-
titled to immediate release.  Applicants "shall be detained
pending a final determination of credible fear of persecution
and, if found not to have such a fear, until removed."
§1225(b)(1)(B)(iii)(IV).  Applicants who are found to have a
credible fear may also be detained pending further consid-
eration of their asylum applications.  §1225(b)(1)(B)(ii); see
*Jennings* v. *Rodriguez*, 583 U. S. ___, ___, ___ (2018) (slip
op., at 3, 13).[8]

B

The IIRIRA provision at issue in this case, §1252(e)(2),
limits the review that an alien in expedited removal may
obtain via a petition for a writ of habeas corpus.  That pro-
vision allows habeas review of three matters: first,
"whether the petitioner is an alien"; second, "whether the
petitioner was ordered removed"; and third, whether the

———————————
[6] See GAO, Immigration: Actions Needed To Strengthen USCIS's Over-
sight and Data Quality of Credible and Reasonable Fear Screenings 13–
15, and fig. 2 (GAO–20–250, Feb. 2020).

[7] See *id.*, at 16, n. b.

[8] The Department may grant temporary parole "for urgent humanitar-
ian reasons or significant public benefit."  8 U. S. C. §1182(d)(5)(A); see
also 8 CFR §§212.5(b), 235.3(b)(2)(iii), and (4)(ii).

petitioner has already been granted entry as a lawful permanent resident, refugee, or asylee. §§1252(e)(2)(A)–(C). If the petitioner has such a status, or if a removal order has not "in fact" been "issued," §1252(e)(5), the court may order a removal hearing, §1252(e)(4)(B).

A major objective of IIRIRA was to "protec[t] the Executive's discretion" from undue interference by the courts; indeed, "that can fairly be said to be the theme of the legislation." *Reno* v. *American-Arab Anti-Discrimination Comm.*, 525 U. S. 471, 486 (1999) (*AAADC*). In accordance with that aim, §1252(e)(5) provides that "[t]here shall be no review of whether the alien is actually inadmissible or entitled to any relief from removal." And "[n]otwithstanding" any other "habeas corpus provision"—including 28 U. S. C. §2241— "no court shall have jurisdiction to review" any other "individual determination" or "claim arising from or relating to the implementation or operation of an order of [expedited] removal." §1252(a)(2)(A)(i). In particular, courts may not review "the determination" that an alien lacks a credible fear of persecution. §1252(a)(2)(A)(iii); see also §§1252(a)(2)(A)(ii), (iv) (other specific limitations).

Even without the added step of judicial review, the credible-fear process and abuses of it can increase the burdens currently "overwhelming our immigration system." 84 Fed. Reg. 33841 (2019).[9] The past decade has seen a 1,883%

––––––––––

[9] References to the factual material in this regulation are not endorsements of the regulation itself. And like the immigration officials in this case, we do not question the basis for respondent's asserted fear. See *infra*, at 9. But we note the Department's view that credible-fear claims can be asserted "in the hope of a lengthy asylum process that will enable [the claimants] to remain in the United States for years . . . despite their statutory ineligibility for relief" and that an influx of meritless claims can delay the adjudication of meritorious ones; strain detention capacity and degrade detention conditions; cause the release of many inadmissible aliens into States and localities that must shoulder the resulting costs; divert Department resources from protecting the border; and aggravate "the humanitarian crisis created by human smugglers." 84 Fed.

increase in credible-fear claims, and in 2018 alone, there
were 99,035 claims. See *id.*, at 33838 (data for fiscal years
2008 to 2018). The majority have proved to be meritless.
Many applicants found to have a credible fear—about 50%
over the same 10-year period—did not pursue asylum. See
EOIR, Adjudication Statistics: Rates of Asylum Filings in
Cases Originating With a Credible Fear Claim (Nov. 2018);
see also 84 Fed. Reg. 33841 (noting that many instead ab-
scond). In 2019, a grant of asylum followed a finding of
credible fear just 15% of the time. See EOIR, Asylum Deci-
sion Rates in Cases Originating With a Credible Fear Claim
(Oct. 2019). Fraudulent asylum claims can also be difficult
to detect,[10] especially in a screening process that is designed
to be expedited and that is currently handling almost
100,000 claims per year.

The question presented thus has significant conse-
quences for the immigration system. If courts must review
credible-fear claims that in the eyes of immigration officials

_____

Reg. 33831; see also, *e.g.*, Violent Crime Control and Law Enforcement
Act of 1994, §130010(a)(3)(C), 108 Stat. 2030 (legislative finding of "a
drain on limited resources resulting from the high cost of processing friv-
olous asylum claims"); *Arizona* v. *United States*, 567 U. S. 387, 397–398
(2012); Homeland Security Advisory Council, Final Emergency Interim
Report 1, 7–8 (Apr. 16, 2019); Letter from K. Nielsen, Secretary of Home-
land Security, to Members of Congress 1–2 (Mar. 28, 2019); GAO, Asy-
lum: Additional Actions Needed To Assess and Address Fraud Risks 24
(GAO–16–50, Dec. 2015) (GAO Fraud Report); Congressional Budget Of-
fice, The Impact of Unauthorized Immigrants on the Budgets of State
and Local Governments 8–9 (Dec. 2007); Brief for State of Arizona et al.
as *Amici Curiae* 9–12.

[10] See, *e.g.*, GAO Fraud Report 32–33 (discussing Operation Fiction
Writer, a criminal investigation of attorneys and application preparers
who counseled asylum seekers to lie about religious persecution and
forced abortions); Asylum Fraud: Abusing America's Compassion? Hear-
ing before the Subcommittee on Immigration and Border Security of the
House Committee on the Judiciary, 113th Cong., 2d Sess. (2014) (testi-
mony of Louis D. Crocetti, Jr.) (describing study in which 58% of ran-
domly selected asylum applications exhibited indicators of possible fraud
and 12% were determined to be fraudulent).

and an immigration judge do not meet the low bar for such claims, expedited removal would augment the burdens on that system. Once a fear is asserted, the process would no longer be expedited.

C

Respondent Vijayakumar Thuraissigiam, a Sri Lankan national, crossed the southern border without inspection or an entry document at around 11 p.m. one night in January 2017. App. 38. A Border Patrol agent stopped him within 25 yards of the border, and the Department detained him for expedited removal. *Id.*, at 37–39, 106; see §§1182(a)(7)(A)(i)(I), 1225(b)(1)(A)(ii), and (b)(1)(B)(iii)(IV). He claimed a fear of returning to Sri Lanka because a group of men had once abducted and severely beaten him, but he said that he did not know who the men were, why they had assaulted him, or whether Sri Lankan authorities would protect him in the future. *Id.*, at 80. He also affirmed that he did not fear persecution based on his race, political opinions, or other protected characteristics. *Id.*, at 76–77; see §1101(a)(42)(A).

The asylum officer credited respondent's account of the assault but determined that he lacked a "credible" fear of persecution, as defined by §1225(b)(1)(B)(v), because he had offered no evidence that could have made him eligible for asylum (or other removal relief ). *Id.*, at 83, 87, 89; see §1158(b)(1)(A). The supervising officer agreed and signed the removal order. *Id.*, at 54, 107. After hearing further testimony from respondent, an Immigration Judge affirmed on *de novo* review and returned the case to the Department for removal. *Id.*, at 97.

Respondent then filed a federal habeas petition. Asserting for the first time a fear of persecution based on his Tamil ethnicity and political views, *id.*, at 12–13, he argued that he "should have passed the credible fear stage," *id.*, at 30. But, he alleged, the immigration officials deprived him

of "a meaningful opportunity to establish his claims" and
violated credible-fear procedures by failing to probe past his
denial of the facts necessary for asylum. *Id.*, at 27, 32. Al-
legedly they also failed to apply the "correct standard" to
his claims—the "significant possibility" standard—despite
its repeated appearance in the records of their decisions.
*Id.*, at 30; see *id.*, at 53, 84–89, 97. Respondent requested
"a writ of habeas corpus, an injunction, or a writ of manda-
mus directing [the Department] to provide [him] a new op-
portunity to apply for asylum and other applicable forms of
relief." *Id.*, at 33. His petition made no mention of release
from custody.

The District Court dismissed the petition, holding that
§§1252(a)(2) and (e)(2) and clear Ninth Circuit case law
foreclosed review of the negative credible-fear determina-
tion that resulted in respondent's expedited removal order.
287 F. Supp. 3d 1077, 1081 (SD Cal. 2018). The court also
rejected respondent's argument "that the jurisdictional lim-
itations of §1252(e) violate the Suspension Clause," again
relying on Circuit precedent. *Id.*, at 1082–1083.

The Ninth Circuit reversed. It found that our Suspension
Clause precedent demands "reference to the writ as it stood
in 1789." 917 F. 3d 1097, 1111 (2019). But without citing
any pre-1789 case about the scope of the writ, the court held
that §1252(e)(2) violates the Suspension Clause. See *id.*, at
1113–1119. The court added that respondent "has proce-
dural due process rights," specifically the right "'to expe-
dited removal proceedings that conformed to the dictates of
due process.'" *Id.*, at 1111, n. 15 (quoting *United States* v.
*Raya-Vaca*, 771 F. 3d 1195, 1203 (CA9 2014)). Although the
decision applied only to respondent, petitioners across the
Circuit have used it to obtain review outside the scope of
§1252(e)(2), and petitioners elsewhere have attempted to

follow suit.[11]

The Ninth Circuit's decision invalidated the application of an important provision of federal law and conflicted with a decision from another Circuit, see *Castro* v. *United States Dept. of Homeland Security*, 835 F. 3d 422 (CA3 2016). We granted certiorari, 589 U. S. ___ (2019).

## II

## A

The Suspension Clause provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, §9, cl. 2. In *INS* v. *St. Cyr*, 533 U. S. 289 (2001), we wrote that the Clause, at a minimum, "protects the writ as it existed in 1789," when the Constitution was adopted. *Id.*, at 301 (internal quotation marks omitted). And in this case, respondent agrees that "there is no reason" to consider whether the Clause extends any further. Brief for Respondent 26, n. 12. We therefore proceed on that basis.[12]

––––––––––

[11] See, *e.g.*, *Mnatsakanyan* v. *United States Dept. of Homeland Security*, 2020 WL 1245371, *5 (SD Cal., Mar. 16, 2020) ("Given the identical claims here as in *Thuraissigiam*, the Court concludes it has jurisdiction over Petitioner's habeas petition under the Suspension Clause"); *Kaur* v. *Barr*, 2019 WL 4974425, *3 (D Ariz., Oct. 8, 2019) (granting stay of removal in light of the decision below); *Rodrigues* v. *McAleenan*, 2020 WL 363041, *2, *6 (ND Tex., Jan. 22, 2020) (declining to follow the decision below).

[12] The original meaning of the Suspension Clause is the subject of controversy. In *INS* v. *St. Cyr*, 533 U. S. 289 (2001), the majority and dissent debated whether the Clause independently guarantees the availability of the writ or simply restricts the temporary withholding of its operation. Compare *id.*, at 300, with *id.*, at 336–341 (Scalia, J., dissenting). See also *Ex parte Bollman*, 4 Cranch 75, 95 (1807). We do not revisit that question. Nor do we consider whether the scope of the writ as it existed in 1789 defines the boundary of the constitutional protection to which the *St. Cyr* Court referred, since the writ has never encompassed respondent's claims.

B

This principle dooms respondent's Suspension Clause argument, because neither respondent nor his *amici* have shown that the writ of habeas corpus was understood at the time of the adoption of the Constitution to permit a petitioner to claim the right to enter or remain in a country or to obtain administrative review potentially leading to that result. The writ simply provided a means of contesting the lawfulness of restraint and securing release.

In 1768, Blackstone's Commentaries—usually a "satisfactory exposition of the common law of England," *Schick* v. *United States*, 195 U. S. 65, 69 (1904)—made this clear. Blackstone wrote that habeas was a means to "remov[e] the injury of unjust and illegal confinement." 3 W. Blackstone, Commentaries on the Laws of England 137 (emphasis deleted). Justice Story described the "common law" writ the same way. See 3 Commentaries on the Constitution of the United States §1333, p. 206 (1833). Habeas, he explained, "is the appropriate remedy to ascertain . . . whether any person is rightfully in confinement or not." *Ibid.*

We have often made the same point. See, *e.g.*, *Preiser* v. *Rodriguez*, 411 U. S. 475, 484 (1973) ("It is clear . . . from the common-law history of the writ . . . that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody"); *Wilkinson* v. *Dotson*, 544 U. S. 74, 79 (2005) (similar); *Munaf* v. *Geren*, 553 U. S. 674, 693 (2008) (similar).

---

We also do not reconsider whether the common law allowed the issuance of a writ on behalf of an alien who lacked any allegiance to the country. Compare *Boumediene* v. *Bush*, 553 U. S. 723, 746–747 (2008) (forming "no certain conclusions"), with Brief for Criminal Justice Legal Foundation as *Amicus Curiae* 5–13. See also Hamburger, Beyond Protection, 109 Colum. L. Rev. 1823, 1847 (2009); P. Halliday, Habeas Corpus: From England to Empire 204 (2010) (Halliday).

In this case, however, respondent did not ask to be re-leased.[13]  Instead, he sought entirely different relief: vaca-tur of his "removal order" and "an order directing [the De-partment] to provide him with a new . . . opportunity to apply for asylum and other relief from removal."  App. 14 (habeas petition).  See also *id.*, at 31 ("a fair procedure to apply for asylum, withholding of removal, and CAT relief"); *id.*, at 14 ("a new, meaningful opportunity to apply for asy-lum and other relief from removal").  Such relief might fit an injunction or writ of mandamus—which tellingly, his pe-tition also requested, *id.*, at 33—but that relief falls outside the scope of the common-law habeas writ.

Although the historic role of habeas is to secure release from custody, the Ninth Circuit did not suggest that re-lease, at least in the traditional sense of the term,[14] was re-quired.  Instead, what it found to be necessary was a "mean-ingful opportunity" for review of the procedures used in determining that respondent did not have a credible fear of persecution.  917 F. 3d, at 1117.  Thus, even according to

—————

[13] In his brief, respondent states that "he requests an entirely ordinary habeas remedy: conditional release pending a lawful adjudication.  J. A. 33."  Brief for Respondent 29.  Citing the same page, the dissent argues that respondent "asked the district court to '[i]ssue a writ of habeas cor-pus' without further limitation on the kind of relief that might entail." *Post*, at 7 (opinion of SOTOMAYOR, J.) (quoting App. 33).  However, neither on the cited page nor at any other place in the habeas petition is release, conditional or otherwise, even mentioned.  And in any event, as we dis-cuss *infra*, at 15–21, the critical point is that what he sought in the ha-beas petition and still seeks—a writ "directing [the Department] to pro-vide [him] a new opportunity to apply for asylum," App. 33—is not a form of relief that was available in habeas at the time of the adoption of the Constitution.

[14] Although the Ninth Circuit never mentioned release, its opinion might be read to suggest that gaining a right to remain in this country would constitute a release from the "restraint" of exclusion.  See 917 F. 3d 1097, 1117 (2019).  No evidence has been called to our attention that the writ was understood in 1789 to apply to any comparable form of restraint.

the Ninth Circuit, respondent's petition did not call for traditional habeas relief.

Not only did respondent fail to seek release, he does not dispute that confinement during the pendency of expedited asylum review, and even during the additional proceedings he seeks, is lawful. Nor could he. It is not disputed that he was apprehended in the very act of attempting to enter this country; that he is inadmissible because he lacks an entry document, see §§1182(a)(7)(A), 1225(b)(1)(A)(i); and that, under these circumstances, his case qualifies for the expedited review process, including "[m]andatory detention" during his credible-fear review, §§1225(b)(1)(B)(ii), (iii)(IV). Moreover, simply releasing him would not provide the right to stay in the country that his petition ultimately seeks. Without a change in status, he would remain subject to arrest, detention, and removal. §§1226(a), 1229a(e)(2).

While respondent does not claim an entitlement to release, the Government is happy to release him—provided the release occurs in the cabin of a plane bound for Sri Lanka. That would be the equivalent of the habeas relief Justice Story ordered in a case while riding circuit. He issued a writ requiring the release of a foreign sailor who jumped ship in Boston, but he provided for the sailor to be released into the custody of the master of his ship. *Ex parte D'Olivera*, 7 F. Cas. 853, 854 (No. 3,967) (CC Mass. 1813).

Respondent does not want anything like that. His claim is more reminiscent of the one we rejected in *Munaf*. In that case, American citizens held in U. S. custody in Iraq filed habeas petitions in an effort to block their transfer to Iraqi authorities for criminal prosecution. See 553 U. S., at 692. Rejecting this use of habeas, we noted that "[h]abeas is at its core a remedy for unlawful executive detention" and that what these individuals wanted was not "simple release" but an order requiring them to be brought to this country. *Id.*, at 693, 697. Claims so far outside the "core" of habeas may not be pursued through habeas. See, *e.g.*,

*Skinner* v. *Switzer*, 562 U. S. 521, 535, n. 13 (2011).

Like the habeas petitioners in *Munaf*, respondent does not want "simple release" but, ultimately, the opportunity to remain lawfully in the United States. That he seeks to stay in this country, while the habeas petitioners in *Munaf* asked to be brought here from Iraq, see *post*, at 19–20 (opinion of SOTOMAYOR, J.), is immaterial. In this case as in *Munaf*, the relief requested falls outside the scope of the writ as it was understood when the Constitution was adopted. See *Castro*, 835 F. 3d, at 450–451 (Hardiman, J., concurring dubitante) ("Petitioners here seek to alter their status in the United States in the hope of avoiding release to their homelands. That prayer for relief . . . dooms the merits of their Suspension Clause argument" (emphasis deleted)).

## III

Disputing this conclusion, respondent argues that the Suspension Clause guarantees a broader habeas right. To substantiate this claim, he points to three bodies of case law: British and American cases decided prior to or around the time of the adoption of the Constitution, decisions of this Court during the so-called "finality era" (running from the late 19th century to the mid-20th century), and two of our more recent cases. None of these sources support his argument.

### A

Respondent and *amici* supporting his position have done considerable research into the use of habeas before and around the time of the adoption of the Constitution,[15] but

———————

[15] Respondent and his *amici* rely primarily on British cases decided before the adoption of the Constitution. "There is widespread agreement that the common-law writ of *habeas corpus* was in operation in all thirteen of the British colonies that rebelled in 1776," but "almost no reported decisio[n] from the period." Oldham & Wishnie, The Historical Scope of Habeas Corpus and *INS* v. *St. Cyr*, 16 Geo. Immigration L. J.

they have not unearthed evidence that habeas was then
used to obtain anything like what is sought here, namely,
authorization for an alien to remain in a country other than
his own or to obtain administrative or judicial review lead-
ing to that result.  All that their research (and the dissent's)
shows is that habeas was used to seek release from deten-
tion in a variety of circumstances.  In fact, respondent and
his *amici* do not argue that their cases show anything more.
See Brief for Respondent 27 (arguing that habeas was
"available" at the founding "to test all forms of physical re-
straint"); Brief for Scholars of the Law of Habeas Corpus as
*Amici Curiae* 11 (the "historical record . . . demonstrates
that the touchstone for access to the writ" was "whether the
petitioner challenges control of his person").

Because respondent seeks to use habeas to obtain some-
thing far different from simple release, his cause is not
aided by the many release cases that he and his *amici* have
found.  Thus, for present purposes, it is immaterial that ha-
beas was used to seek release from confinement that was
imposed for, among other things, contempt of court (see
*Bushell's Case*, Vaugh. 135, 124 Eng. Rep. 1006 (C. P.
1670)), debt (see *Hollingshead's Case*, 1 Salk. 351, 91 Eng.
Rep. 307 (K. B. 1702); *Rex* v. *Nathan*, 2 Str. 880, 93 Eng.
Rep. 914 (K. B. 1724)), medical malpractice (see *Dr. Groen-
velt's Case*, 1 Raym. Ld. 213, 91 Eng. Rep. 1038 (K. B.
1702)), failing to pay an assessment for sewers (see *Hetley*
v. *Boyer*, Cro. Jac. 336, 79 Eng. Rep. 287 (K. B. 1613)), fail-
ure to lend the King money (see *Darnel's Case*, 3 How. St.
Tr. 1 (K. B. 1627)), carrying an authorized "dagg," *i.e.*, hand-
gun (see *Gardener's Case*, Cro. Eliz. 821, 78 Eng. Rep. 1048
(K. B. 1600)), "impressment" into military service or invol-
untary servitude (see *St. Cyr*, 533 U. S., at 302), or refusing
to pay a colonial tax (see Oldham & Wishnie 496).  Nor does
it matter that common-law courts sometimes ordered or

_____

485, 496 (2002) (Oldham & Wishnie) (internal quotation marks omitted).

considered ordering release in circumstances that would be beyond the reach of any habeas statute ever enacted by Congress, such as release from private custody. See, *e.g.*, *Rex* v. *Delaval*, 3 Burr. 1434, 1435–1437, 97 Eng. Rep. 913, 914 (K. B. 1763) (release of young woman from "indentures of apprenticeship"); *Rex* v. *Clarkson*, 1 Str. 444, 93 Eng. Rep. 625 (K. B. 1722) (release from boarding school); *Lister's Case*, 8 Mod. 22, 88 Eng. Rep. 17 (K. B. 1721) (release of wife from estranged husband's restraint). What matters is that all these cases are about release from restraint. Accord, *Preiser*, 411 U. S., at 484–485, and nn. 3–5.[16]

Respondent and his *amici* note that habeas petitioners were sometimes released on the condition that they conform to certain requirements. See Brief for Respondent 30; Legal Historians Brief 18. For example, they cite a case in which a man was released on condition that he treat his wife well and support her, and another in which a man was released on condition that he issue an apology. *Ibid.* But what respondent sought in this case is nothing like that. Respondent does not seek an order releasing him on the condition that he do or refrain from doing something. What he wants—further review of his asylum claim—is not a condition with which he must comply. Equally irrelevant is the practice, discussed in the dissent, of allowing the executive to justify or cure a defect in detention before requiring release. See *post*, at 16–18. Respondent does not seek this sort of conditional release either, because the legality of his detention is not in question.

---

[16] Respondent's *amici* also point out that, during the English Civil War, Parliament created a national religion and a "bewildering array of committees" to manage the war. Brief for Legal Historians as *Amici Curiae* 10 (Legal Historians Brief) (internal quotation marks omitted). They argue that "[h]abeas corpus was readily available to test the legality of their actions." *Ibid.* But according to their source, the challenged actions were "imprisonment orders," including imprisonment of clergymen who refused to conform. Halliday 163–164.

Respondent contends that two cases show that habeas could be used to secure the right of a non-citizen to remain in a foreign country, but neither proves his point. His first case, involving a Scot named Murray, is one for which no official report is available for us to review.[17]  We could hardly base our decision here on such a decision.[18]

His second case, *Somerset* v. *Stewart*, Lofft. 1, 98 Eng. Rep. 499 (K. B. 1772), is celebrated but does not aid respondent.  James Somerset was a slave who was "detain[ed]" on a ship bound for Jamaica, and Lord Mansfield famously ordered his release on the ground that his detention as a slave was unlawful in England. *Id*., at 19, 98 Eng. Rep., at 510.  This relief, release from custody, fell within the historic core of habeas, and Lord Mansfield did not order anything else.

It may well be that a collateral consequence of Somerset's release was that he was allowed to remain in England, but if that is so, it was due not to the writ issued by Lord Mansfield, but to English law regarding entitlement to reside in the country.  At the time, England had nothing like modern immigration restrictions.  As late as 1816, the word "deportation" apparently "was not to be found in any English dic-

––––––––––

[17] Respondent cites a secondary source, which in turn cites to the National Archives in London.  See Brief for Respondent 27 (citing Halliday 236).

[18] Whether the founding generation understood habeas relief more broadly than described by Blackstone, Justice Story, and our prior cases, see *supra*, at 12, cannot be settled by a single case or even a few obscure and possibly aberrant cases.  And in any event, what is said here about Murray's case provides little support for respondent's position.  In 1677, we are told, Murray was imprisoned in England so that he could be "'sent into Scotland'" for a criminal trial, but the King's Bench twice issued a writ of habeas corpus requiring his release.  Brief for Respondent 27 (quoting Halliday 236).  Putting aside the "delicate" relationship between England and Scotland at the time, *Boumediene*, 553 U. S., at 749, issuance of a writ to secure the release of a person held in pretrial custody is far afield from what respondent wants here.

tionary." The Use of the Crown's Power of Deportation Under the Aliens Act, 1793–1826, in J. Dinwiddy, Radicalism and Reform in Britain, 1780–1850, p. 150, n. 4 (1992); see also, *e.g.*, Craies, The Right of Aliens To Enter British Territory, 6 L. Q. Rev. 27, 35 (1890) ("England was a complete asylum to the foreigner who did not offend against its laws"); Haycraft, Alien Legislation and the Prerogative of the Crown, 13 L. Q. Rev. 165, 180 (1897) ("There do not appear to have been any transactions in Parliament or in the [Crown's] Privy Council directly affecting [deportation] from the time of Elizabeth [I] to that of George III").[19]

For a similar reason, respondent cannot find support in early 19th-century American cases in which deserting foreign sailors used habeas to obtain their release from the custody of American officials. In none of the cases involving deserters that have been called to our attention did the court order anything more than simple release from custody. As noted, Justice Story ordered a sailor's release into the custody of his ship's master. See *Ex parte D'Olivera*, 7 F. Cas., at 854. Other decisions, while ordering the release of detained foreign deserters because no statute authorized detention, chafed at having to order even release. See *Case of the Deserters from the British Frigate L'Africaine*, 3 Am. L. J. & Misc. Repertory 132, 135–136 (Md. 1810) (reporting judge's statement "that he never would interfere to prevent" the British consul himself from detaining British deserters); *Case of Hippolyte Dumas*, 2 Am. L. J. & Misc. Repertory 86, 87 (Pa. 1809) (noting "inconvenience" that U. S. law did not discourage desertion of foreign sailors); *Commonwealth* v. *Holloway*, 1 Serg. & Rawle 392, 396 (Pa. 1815) (opinion of Tilghman, C. J.) (same); *id.*, at

—————————

[19] This regime lasted until after 1789, when the Aliens Act of 1793 authorized justices of the peace to imprison "without bail or mainprize" (*i.e.*, bond) any alien found without a passport, who could then be "sen[t] out of th[e] realm." An Act for Regulating Immigration into Great Britain, 33 Geo. III, ch. 4, §§11, 29.

397 (opinion of Yeates, J.) (same).  These cases thus do not
contemplate the quite different relief that respondent asks
us to sanction here.

In these cases, as in *Somerset*, it may be that the released
petitioners were able to remain in the United States as a
collateral consequence of release, but if so, that was due not
to the writs ordering their release, but to U. S. immigration
law or the lack thereof.  These decisions came at a time
when an "open door to the immigrant was the . . . federal
policy."  *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588,
n. 15 (1952); see also *St. Cyr*, 533 U. S., at 305 (first immi-
gration regulation enacted in 1875).  So release may have
had the side effect of enabling these individuals to remain
in this country, but that is beside the point.

The relief that a habeas court may order and the collat-
eral consequences of that relief are two entirely different
things.  Ordering an individual's release from custody may
have the side effect of enabling that person to pursue all
sorts of opportunities that the law allows.  For example, re-
lease may enable a qualified surgeon to operate on a pa-
tient; a licensed architect may have the opportunity to de-
sign a bridge; and a qualified pilot may be able to fly a
passenger jet.  But a writ of habeas could not be used to
compel an applicant to be afforded those opportunities or as
a means to obtain a license as a surgeon, architect, or pilot.
Similarly, while the release of an alien may give the alien
the opportunity to remain in the country if the immigration
laws permit, we have no evidence that the writ as it was
known in 1789 could be used to require that aliens be per-
mitted to remain in a country other than their own, or as a
means to seek that permission.

Respondent's final examples involve international extra-
dition, but these cases are no more pertinent than those al-
ready discussed.  For one thing, they post-date the founding
era.  England was not a party to any extradition treaty in
1789, and this country's first extradition treaty was the Jay

Treaty of 1794. See 1 J. Moore, Extradition and Interstate Rendition §§7, 78, pp. 10, 89 (1891). In any event, extradition cases, similar to the deserter cases, illustrate nothing more than the use of habeas to secure release from custody when not in compliance with the extradition statute and relevant treaties. As noted by a scholar on whose work respondent relies, these cases "examine[d] the lawfulness of magistrates' decisions permitting the executive to detain aliens." Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1003 (1998). In these cases, as in all the others noted above, habeas was used "simply" to seek release from allegedly unlawful detention. *Benson* v. *McMahon*, 127 U. S. 457, 463 (1888). See also, *e.g.*, *In re Stupp*, 23 F. Cas. 296, 303 (No. 13,563) (CC SDNY 1875).[20]

Despite pages of rhetoric, the dissent is unable to cite a single pre-1789 habeas case in which a court ordered relief that was anything like what respondent seeks here. The

--------

[20]*Amici* supporting respondent make an additional argument. They contend that "[i]n eighteenth century practice, the authority of English judges to review habeas petitions was not constrained by past decisions" and that these judges felt free to innovate in order to ensure that justice was done. Legal Historians Brief 5–6. But the role of federal courts under our Constitution is very different from that of those English judges. The English judges "were considered agents of the Crown, designed to assist the King in the exercise of his power." *Boumediene*, 553 U. S., at 740. The court with primary habeas jurisdiction, after all, was called the King's Bench, on which the King "was theoretically always present." Halliday & White, The Suspension Clause: English Text, Imperial Contexts, and American Implications, 94 Va. L. Rev. 575, 594, 598, and n. 49 (2008). Habeas was an exercise of the King's prerogative "to have an account . . . why the liberty of any of his subjects is restrained." 2 J. Story, Commentaries on the Constitution of the United States §1335, p. 207 (1833); accord, Legal Historians Brief 5–7. In our federal courts, by contrast, the scope of habeas has been tightly regulated by statute, from the Judiciary Act of 1789 to the present day, and precedent is as binding in a habeas case as in any other. See, *e.g.*, *Jenkins* v. *Hutton*, 582 U. S. ___, ___ (2017) (*per curiam*) (slip op., at 4).

dissent instead contends that "the Suspension Clause in-
quiry does not require a close (much less precise) factual
match with historical habeas precedent," *post*, at 11, and
then discusses cases that are not even close to this one.  The
dissent reveals the true nature of its argument by suggest-
ing that there are "inherent difficulties [in] a strict original-
ist approach in the habeas context because of, among other
things, the dearth of reasoned habeas decisions at the
founding."  *Ibid*.  But respondent does not ask us to hold
that the Suspension Clause guarantees the writ as it might
have evolved since the adoption of the Constitution.  On the
contrary, as noted at the outset of this discussion, he rests
his argument on "the writ as it existed in 1789."  Brief for
Respondent 26, n. 12.

What the dissent merely implies, one concurring opinion
states expressly, arguing that the scope of the writ guaran-
teed by the Suspension Clause "may change 'depending
upon the circumstances'" and thus may allow certain aliens
to seek relief other than release.  *Post*, at 3 (BREYER, J.,
concurring in judgment) (quoting *Boumediene*, 553 U. S., at
779).  But that is not respondent's argument, and as a gen-
eral rule "we rely on the parties to frame the issues for de-
cision and assign to courts the role of neutral arbiter of mat-
ters the parties present."  *United States* v. *Sineneng-Smith*,
590 U. S. ___, ___ (2020) (slip op., at 3) (internal quotation
marks omitted).  In any event, the concurrence's snippets of
quotations from *Boumediene* are taken entirely out of con-
text.  They relate to the question whether the statutory re-
view procedures for Guantanamo detainees *seeking release
from custody* provided an adequate substitute for a habeas
petition *seeking release*.  See *infra*, at 32–33.  They do not
suggest that any habeas writ guaranteed by the Suspension
Clause permits a petitioner to obtain relief that goes far be-

yond the "core" of habeas as "a remedy for unlawful execu-
tive detention." *Munaf*, 553 U. S., at 693.[21]

## B

We now proceed to consider the second body of case law
on which respondent relies, decisions of this Court during
the "finality era," which takes its name from a feature of the
Immigration Act of 1891 making certain immigration deci-
sions "final." Although respondent claims that his argu-
ment is supported by "the writ as it existed in 1789," Brief
for Respondent 26, n. 12, his argument focuses mainly on
this body of case law, which began a century later. These
cases, he claims, held that "the Suspension Clause man-
dates a minimum level of judicial review to ensure that the

————————
[21] This concurrence imagines three horrible possibilities that it fears
could come to pass unless we interpret the Suspension Clause to protect
the right to some undefined category of relief beyond release from cus-
tody. See *post*, at 2 (opinion of BREYER, J.). But its interpretation is nei-
ther necessary nor obviously sufficient to prevent the possibilities it
fears. First, if a citizen were detained for deportation, today's opinion
would not prevent the citizen from petitioning for release. Second, if re-
spondent's "procedural" claims do not merit habeas review, as the con-
currence concludes, *post*, at 8, it is not clear why habeas should help the
concurrence's hypothetical alien whose credible-fear claim was rejected
based on forged evidence. Both respondent and this hypothetical alien
assert procedural irregularities. Does the availability of habeas review
depend on a judge's view of the severity of the irregularity asserted? Fi-
nally, there is the hypothetical alien denied asylum on the ground that
Judaism is not a religion. Such a decision would of course be ridiculous,
but why it would not raise a question of "brute fac[t]" that falls outside
the concurrence's interpretation of the Suspension Clause, *post*, at 5, is
again not clear.

Whatever may be said about the concurrence's hypotheticals, it is pos-
sible to imagine all sorts of abuses not even remotely related to unau-
thorized executive detention that could be imposed on people in this
country if the Constitution allowed Congress to deprive the courts of any
jurisdiction to entertain claims regarding such abuses. If that were to
happen, it would no doubt be argued that constitutional provisions other
than the Suspension Clause guaranteed judicial review. We have no oc-
casion to consider such arguments here.

Executive complies with the law in effectuating removal."
*Id.*, at 11–12. The Ninth Circuit also relied heavily on these
cases and interpreted them to "suggest that the Suspension
Clause requires review of legal and mixed questions of law
and fact related to removal orders." 917 F. 3d, at 1117.

This interpretation of the "finality era" cases is badly mis-
taken. Those decisions were based not on the Suspension
Clause but on the habeas statute and the immigration laws
then in force. The habeas statute in effect during this time
was broad in scope. It authorized the federal courts to re-
view whether a person was being held in custody in viola-
tion of any federal law, including immigration laws. Thus,
when aliens claimed that they were detained in violation of
immigration statutes, the federal courts considered
whether immigration authorities had complied with those
laws. This, of course, required that the immigration laws
be interpreted, and at the start of the finality era, this Court
interpreted the 1891 Act's finality provision to block review
of only questions of fact. Accordingly, when writs of habeas
corpus were sought by aliens who were detained on the
ground that they were not entitled to enter this country, the
Court considered whether, given the facts found by the im-
migration authorities, the detention was consistent with
applicable federal law. But the Court exercised that review
because it was authorized to do so by statute. The decisions
did not hold that this review was required by the Suspen-
sion Clause.

In this country, the habeas authority of federal courts has
been addressed by statute from the very beginning. The
Judiciary Act of 1789, §14, 1 Stat. 82, gave the federal
courts the power to issue writs of habeas corpus under spec-
ified circumstances, but after the Civil War, Congress en-
acted a much broader statute. That law, the Habeas Cor-
pus Act of 1867, provided that "the several courts of the
United States . . . shall have power to grant writs of habeas
corpus in all cases where any person may be restrained of

his or her liberty in violation of the constitution, or of any treaty or law of the United States." Judiciary Act of Feb. 5, 1867, §1, 14 Stat. 385. The Act was "of the most comprehensive character," bringing "within the *habeas corpus* jurisdiction of every court and of every judge every possible case of privation of liberty contrary" to federal law. *Ex parte McCardle*, 6 Wall. 318, 325–326 (1868). This jurisdiction was "impossible to widen." *Id.*, at 326; see *Fay* v. *Noia*, 372 U. S. 391, 415 (1963) (noting the Act's "expansive language" and "imperative tone"). The 1867 statute, unlike the current federal habeas statute, was not subject to restrictions on the issuance of writs in immigration matters, and in *United States* v. *Jung Ah Lung*, 124 U. S. 621 (1888), the Court held that an alien in immigration custody could seek a writ under that statute. *Id.*, at 626. This provided the statutory basis for the writs sought in the finality era cases.

The Immigration Act of 1891, enacted during one of the country's great waves of immigration, required the exclusion of certain categories of aliens and established procedures for determining whether aliens fell within one of those categories. The Act required the exclusion of "idiots, insane persons, paupers or persons likely to become a public charge," persons with infectious diseases, persons with convictions for certain crimes, some individuals whose passage had been paid for by a third party, and certain laborers. Act of Mar. 3, 1891, ch. 551, §1, 26 Stat. 1084. Inspection officers were authorized to board arriving vessels and inspect any aliens on board. §8, *id.*, at 1085. And, in the provision of central importance here, the Act provided that "[a]ll decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." *Ibid.* Later

immigration Acts, which remained in effect until 1952,[22] contained similar provisions. See Act of 1894, 28 Stat. 390; Immigration Act of 1907, §25, 34 Stat. 907; Immigration Act of 1917, §17, 39 Stat. 887.

The first of the finality era cases, *Nishimura Ekiu* v. *United States*, 142 U. S. 651 (1892), required the Court to address the effect of the 1891 Act's finality provision in a habeas case. *Nishimura Ekiu* is the cornerstone of respondent's argument regarding the finality era cases, so the opinion in that case demands close attention.

The case involved an alien who was detained upon arrival based on the immigration inspector's finding that she was liable to become a public charge. Seeking to be released, the alien applied to the Circuit Court for a writ of habeas corpus and argued that the 1891 Act, if construed to give immigration authorities the "exclusive authority to determine" her right to enter, would violate her constitutional right to the writ of habeas corpus and her right to due process. *Id.*, at 656 (statement of the case). The Circuit Court refused to issue the writ, holding that the determination of the inspector of immigration was not subject to review, and the alien then appealed.

This Court upheld the denial of the writ. The Court interpreted the 1891 Act to preclude judicial review only with respect to questions of fact. *Id.*, at 660. And after interpreting the 1891 Act in this way, the Court found that "the act of 1891 is constitutional." *Id.*, at 664.

The Court's narrow interpretation of the 1891 Act's finality provision meant that the federal courts otherwise retained the full authority granted by the Habeas Corpus Act of 1867 to determine whether an alien was detained in violation of federal law. Turning to that question, the Court

---

[22] See *Shaughnessy* v. *Pedreiro*, 349 U. S. 48, 51–52 (1955) (interpreting 1952 Immigration and Nationality Act, 66 Stat. 163, to provide for review of deportation orders).

held that the only procedural rights of an alien seeking to enter the country are those conferred by statute. "As to such persons," the Court explained, "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Id.*, at 660. The Court therefore considered whether the procedures set out in the 1891 Act had been followed, and finding no violation, affirmed the denial of the writ. *Id.*, at 661–664. What is critical for present purposes is that the Court did not hold that the Suspension Clause imposed any limitations on the authority of Congress to restrict the issuance of writs of habeas corpus in immigration matters.

Respondent interprets *Nishimura Ekiu* differently. See Brief for Respondent 13–15. As he reads the decision, the Court interpreted the 1891 Act to preclude review of *all questions* related to an alien's entitlement to enter the country. Any other interpretation, he contends, would fly in the face of the statutory terms. But, he maintains, the Court held that this limitation violated the Suspension Clause except with respect to questions of fact, and it was for this reason that the Court considered whether the procedures specified by the 1891 Act were followed. In other words, he reads *Nishimura Ekiu* as holding that the 1891 Act's finality provision was unconstitutional in most of its applications (*i.e.*, to all questions other than questions of fact).

This interpretation is wrong. The opinion in *Nishimura Ekiu* states unequivocally that "the act of 1891 is constitutional," *id.*, at 664, not that it is constitutional only in part. And if there is any ambiguity in the opinion regarding the Court's interpretation of the finality provision, the later decision in *Gegiow* v. *Uhl*, 239 U. S. 3 (1915), left no doubt. What *Nishimura Ekiu* meant, *Gegiow* explained, was that the immigration authorities' factual findings were conclusive (as *Gegiow* put it, "[t]he conclusiveness of the decisions of immigration officers . . . is conclusiveness upon matters of fact") and therefore, the Court was "not forbidden by the

statute to consider" in a habeas proceeding "whether the reasons" for removing an alien "agree with the requirements of the act." 239 U. S., at 9. In light of this interpretation, the *Nishimura Ekiu* Court had no occasion to decide whether the Suspension Clause would have tolerated a broader limitation, and there is not so much as a hint in the opinion that the Court considered this question. Indeed, the opinion never even mentions the Suspension Clause, and it is utterly implausible that the Court would hold *sub silentio* that Congress had violated that provision.

Holding that an Act of Congress unconstitutionally suspends the writ of habeas corpus is momentous. See *Boumediene*, 553 U. S., at 773 (noting "the care Congress has taken throughout our Nation's history" to avoid suspension). The Justices on the Court at the beginning of the finality era had seen historic occasions when the writ was suspended—during the Civil War by President Lincoln and then by Congress, and later during Reconstruction by President Grant. See *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 563 (2004) (Scalia, J., dissenting) (discussing these events). The suspension of habeas during this era played a prominent role in our constitutional history. See *Ex parte Merryman*, 17 F. Cas. 144, 151–152 (No. 9,487) (CC Md. 1861) (Taney, C. J.); *Ex parte Milligan*, 4 Wall. 2, 116, 131 (1866). (Two of the Justices at the beginning of the finality era were on the Court when *Ex parte Milligan* was decided.) The Justices knew a suspension of the writ when they saw one, and it is impossible to believe that the *Nishimura Ekiu* Court identified another occasion when Congress had suspended the writ and based its decision on the Suspension Clause without even mentioning that provision.

The dissent's interpretation of *Nishimura Ekiu* is different from respondent's. According to the dissent, *Nishimura Ekiu* interpreted the 1891 Act as it did based on the doctrine of constitutional avoidance. See *post*, at 22. This reading has no support in the Court's opinion, which never

mentions the Suspension Clause or the avoidance doctrine and never explains why the Clause would allow Congress to preclude review of factual findings but nothing more. But even if there were some basis for this interpretation, it would not benefit respondent, and that is undoubtedly why he has not made the argument. IIRIRA unequivocally bars habeas review of respondent's claims, see §1252(e)(2), and he does not argue that it can be read any other way. The avoidance doctrine "has no application in the absence of ambiguity." *Warger* v. *Shauers*, 574 U. S. 40, 50 (2014) (internal quotation marks and ellipsis omitted). Thus, if *Nishimura Ekiu*'s interpretation were based on constitutional avoidance, it would still not answer the interpretive question here.

When we look to later finality era cases, any suggestion of a Suspension Clause foundation becomes even less plausible. None of those decisions mention the Suspension Clause or even hint that they are based on that provision, and these omissions are telling. On notable occasions during that time, the writ was suspended—in the Philippines in 1906[23] and Hawaii in 1941.[24] During World War II, the Court held that "enemy aliens" could utilize habeas "unless there was suspension of the writ." *In re Yamashita*, 327 U. S. 1, 9 (1946). And the Court invoked the Suspension Clause in holding that the Executive lacked authority to intern a Japanese-American citizen. See *Ex parte Endo*, 323 U. S. 283, 297–299 (1944). If the Justices during that time had thought that the Suspension Clause provided the authority they were exercising in the many cases involving habeas petitions by aliens detained prior to entry, it is hard

---

[23] While the Philippines was a Territory, its government suspended habeas to deal with "'certain organized bands'" of rebels. *Fisher* v. *Baker*, 203 U. S. 174, 179–181 (1906) (quoting resolution).

[24] The Governor of Hawaii suspended habeas, with President Roosevelt's approval, after the attack on Pearl Harbor. See *Duncan* v. *Kahanamoku*, 327 U. S. 304, 307–308, 324 (1946).

to believe that this important fact would have escaped mention.

Respondent suggests that *Nishimura Ekiu* cannot have interpreted the 1891 Act's finality provision to apply only to factual questions because the statutory text categorically bars all review. The important question here, however, is *what the Court did* in *Nishimura Ekiu*, not whether its interpretation was correct, and in any event, there was a reasonable basis for the Court's interpretation.

The determinations that the immigration officials were required to make under the 1891 Act were overwhelmingly factual in nature. The determination in Nishimura's case— that she was likely to become a public charge—seems to have been a pure question of fact, and the other grounds for exclusion under the Act involved questions that were either solely or at least primarily factual in nature.

If we were now called upon to determine the meaning of a provision like the finality provision in the 1891 Act, our precedents would provide the basis for an argument in favor of the interpretation that the *Nishimura Ekiu* Court reached. The presumption in favor of judicial review, see, *e.g.*, *Guerrero-Lasprilla* v. *Barr*, 589 U. S. ___, ___ (2020) (slip op., at 6); *Nasrallah* v. *Barr*, 590 U. S. ___, ___–___ (2020) (slip op., at 7–9), could be invoked. So could the rule that "[i]mplications from statutory text or legislative history are not sufficient to repeal habeas jurisdiction." *St. Cyr*, 533 U. S., at 299; accord, *Ex parte Yerger*, 8 Wall. 85, 105 (1869). Thus, respondent's interpretation of the decision in *Nishimura Ekiu* is wrong, and the same is true of his understanding of the later finality era cases.

Rather than relying on the Suspension Clause, those cases simply involved the exercise of the authority conferred by the habeas statute then in effect. This was true of *Nishimura Ekiu*, *Gegiow*, and every other finality era case that respondent cites in support of his Suspension Clause argument. See, *e.g.*, *Gonzales* v. *Williams*, 192 U. S.

Opinion of the Court

1 (1904); *Yee Won* v. *White*, 256 U. S. 399 (1921); *Tod* v. *Waldman*, 266 U. S. 113 (1924); *United States ex rel. Polymeris* v. *Trudell*, 284 U. S. 279 (1932); *United States ex rel. Johnson* v. *Shaughnessy*, 336 U. S. 806 (1949); *United States ex rel. Knauff* v. *Shaughnessy*, 338 U. S. 537 (1950); *Shaughnessy* v. *United States ex rel. Mezei*, 345 U. S. 206 (1953); *United States ex rel. Accardi* v. *Shaughnessy*, 347 U. S. 260 (1954). Some finality era cases presented pure questions of law, while others involved the application of a legal test to particular facts. At least one involved an alien who had entered illegally. See *id.*, at 262. But none was based on the Suspension Clause. No majority opinion even mentioned the Suspension Clause.[25] Indeed, any mention of the Constitution was rare—and unhelpful to respondent's arguments here.[26] And in all the cited cases concerning aliens detained at entry, unlike the case now before us, what was sought—and the only relief considered— was release. Indeed, in an early finality era case, the Court took pains to note that it did not "express any opinion" on whether an alien was entitled to enter. *Lem Moon Sing* v. *United States*, 158 U. S. 538, 549 (1895).

Like the dissent, respondent makes much of certain statements in *Heikkila* v. *Barber*, 345 U. S. 229 (1953), which he interprets to substantiate his interpretation of *Nishimura Ekiu* and the subsequent entry cases discussed above. But he takes these statements out of context and reads far too much into them. *Heikkila* was not a habeas

—————————

[25] In a concurrence in *United States ex rel. Turner* v. *Williams*, 194 U. S. 279 (1904), Justice Brewer stated without elaboration and without citing any authority that the Suspension Clause prohibits Congress from "oust[ing] the courts from the duty of inquiry respecting both law and facts" in habeas cases. *Id.*, at 295. No other Justice joined that opinion.

[26] In *Fong Yue Ting* v. *United States*, 149 U. S. 698, 713 (1893), and many other cases, the Court noted that the Constitution gives Congress plenary power to set requirements for admission.

case, and the question before the Court was whether a deportation order was reviewable under the Administrative Procedure Act (APA). The Court held that the order was not subject to APA review because the Immigration Act of 1917 foreclosed "judicial review"—as opposed to review in habeas. 345 U. S., at 234–235. Nothing in *Heikkila* suggested that the 1891 Act had been found to be partly unconstitutional, and *Heikkila* certainly did not address the scope of the writ of habeas corpus in 1789.

In sum, the Court exercised habeas jurisdiction in the finality era cases because the habeas statute conferred that authority, not because it was required by the Suspension Clause. As a result, these cases cannot support respondent's argument that the writ of habeas corpus as it was understood when the Constitution was adopted would have allowed him to claim the right to administrative and judicial review while still in custody.

## C

We come, finally, to the more recent cases on which respondent relies. The most recent, *Boumediene*, is not about immigration at all. It held that suspected foreign terrorists could challenge their detention at the naval base in Guantanamo Bay, Cuba. They had been "apprehended on the battlefield in Afghanistan" and elsewhere, not while crossing the border. 553 U. S., at 734. They sought only to be released from Guantanamo, not to enter this country. See, *e.g.*, Brief for Petitioner Al Odah et al. in *Al Odah* v. *United States*, decided with *Boumediene* v. *Bush*, O. T. 2007, No. 06–1196, p. 39 (arguing that "habeas contemplates but one remedy," "release"). And nothing in the Court's discussion of the Suspension Clause suggested that they could have used habeas as a means of gaining entry. Rather, the Court reaffirmed that release is the habeas remedy though not the "exclusive" result of every writ, given that it is often "appropriate" to allow the executive to cure defects in a detention.

553 U. S., at 779.

Respondent's other recent case is *St. Cyr*, in which the Court's pertinent holding rejected the argument that certain provisions of IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996 that did not refer expressly to habeas should nevertheless be interpreted as stripping the authority conferred by the habeas statute. In refusing to adopt that interpretation, the Court enlisted a quartet of interpretive canons: "the strong presumption in favor of judicial review of administrative action," "the longstanding rule requiring a clear statement of congressional intent to repeal habeas jurisdiction," the rule that a "clear indication" of congressional intent is expected when a proposed interpretation would push "the outer limits of Congress' power," and the canon of constitutional avoidance. 533 U. S., at 298–300. In connection with this final canon, the Court observed: "Because of [the Suspension] Clause, some 'judicial intervention in deportation cases' is unquestionably 'required by the Constitution.'" *Id.*, at 300 (quoting *Heikkila*, 345 U. S., at 235).

Respondent pounces on this statement, but like the *Heikkila* statement on which it relies, it does nothing for him. The writ of habeas corpus as it existed at common law provided a vehicle to challenge all manner of detention by government officials, and the Court had held long before that the writ could be invoked by aliens already in the country who were held in custody pending deportation. *St. Cyr* reaffirmed these propositions, and this statement in *St. Cyr* does not signify approval of respondent's very different attempted use of the writ, which the Court did not consider.[27]

------

[27] The Government notes other distinctions between *St. Cyr* and this case, including that the alien in *St. Cyr* raised a pure question of law, while respondent raises at best a mixed question of law and fact. We have no need to consider these distinctions.

### IV

In addition to his Suspension Clause argument, respondent contends that IIRIRA violates his right to due process by precluding judicial review of his allegedly flawed credible-fear proceeding.  Brief for Respondent 38–45.  The Ninth Circuit agreed, holding that respondent "had a constitutional right to expedited removal proceedings that conformed to the dictates of due process."  917 F. 3d, at 1111, n. 15 (internal quotation marks omitted).  And the Ninth Circuit acknowledged, *ibid.*, that this holding conflicted with the Third Circuit's decision upholding §1252(e)(2) on the ground that applicants for admission lack due process rights regarding their applications, see *Castro*, 835 F. 3d, at 445–446.  Since due process provided an independent ground for the decision below and since respondent urges us to affirm on this ground, it is hard to understand the dissent's argument that the due process issue was not "seriously in dispute below" or that it is somehow improper for us to decide the issue.  *Post*, at 34.

Nor is the dissent correct in defending the Ninth Circuit's holding.  That holding is contrary to more than a century of precedent.  In 1892, the Court wrote that as to "foreigners who have never been naturalized, nor acquired any domicil or residence within the United States, nor even been admitted into the country pursuant to law," "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress, are due process of law." *Nishimura Ekiu*, 142 U. S., at 660.  Since then, the Court has often reiterated this important rule.  See, *e.g.*, *Knauff*, 338 U. S., at 544 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"); *Mezei*, 345 U. S., at 212 (same); *Landon* v. *Plasencia*, 459 U. S. 21, 32 (1982) ("This Court has long held that an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens

is a sovereign prerogative").

Respondent argues that this rule does not apply to him because he was not taken into custody the instant he attempted to enter the country (as would have been the case had he arrived at a lawful port of entry). Because he succeeded in making it 25 yards into U. S. territory before he was caught, he claims the right to be treated more favorably. The Ninth Circuit agreed with this argument.

We reject it. It disregards the reason for our century-old rule regarding the due process rights of an alien seeking initial entry. That rule rests on fundamental propositions: "[T]he power to admit or exclude aliens is a sovereign prerogative," *id.*, at 32; the Constitution gives "the political department of the government" plenary authority to decide which aliens to admit, *Nishimura Ekiu*, 142 U. S., at 659; and a concomitant of that power is the power to set the procedures to be followed in determining whether an alien should be admitted, see *Knauff*, 338 U. S., at 544.

This rule would be meaningless if it became inoperative as soon as an arriving alien set foot on U. S. soil. When an alien arrives at a port of entry—for example, an international airport—the alien is on U. S. soil, but the alien is not considered to have entered the country for the purposes of this rule. On the contrary, aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are "treated" for due process purposes "as if stopped at the border." *Mezei*, 345 U. S., at 215; see *Leng May Ma* v. *Barber*, 357 U. S. 185, 188–190 (1958); *Kaplan* v. *Tod*, 267 U. S. 228, 230–231 (1925).

The same must be true of an alien like respondent. As previously noted, an alien who tries to enter the country illegally is treated as an "applicant for admission," §1225(a)(1), and an alien who is detained shortly after unlawful entry cannot be said to have "effected an entry," *Zadvydas* v. *Davis*, 533 U. S. 678, 693 (2001). Like an alien

detained after arriving at a port of entry, an alien like re-
spondent is "on the threshold." *Mezei*, 345 U. S., at 212.
The rule advocated by respondent and adopted by the Ninth
Circuit would undermine the "sovereign prerogative" of
governing admission to this country and create a perverse
incentive to enter at an unlawful rather than a lawful loca-
tion. *Plasencia*, 459 U. S., at 32.

For these reasons, an alien in respondent's position has
only those rights regarding admission that Congress has
provided by statute. In respondent's case, Congress pro-
vided the right to a "determin[ation]" whether he had "a
significant possibility" of "establish[ing] eligibility for asy-
lum," and he was given that right. §§1225(b)(1)(B)(ii), (v).
Because the Due Process Clause provides nothing more, it
does not require review of that determination or how it was
made. As applied here, therefore, §1252(e)(2) does not vio-
late due process.[28]

*           *           *

Because the Ninth Circuit erred in holding that
§1252(e)(2) violates the Suspension Clause and the Due
Process Clause, we reverse the judgment and remand the
case with directions that the application for habeas corpus
be dismissed.

*It is so ordered.*

──────────

[28] Although respondent, during his interviews with immigration offi-
cials, does not appear to have provided any information tying the assault
he suffered at the hands of those who arrived at his home in a van to
persecution on the basis of ethnicity or political opinion, his counseled
petition offers details about "white va[n]" attacks against Tamils in
Sri Lanka. App. 25–26 (internal quotation marks omitted). As now por-
trayed, his assault resembles those incidents. Department officials and
immigration judges may reopen cases or reconsider decisions, see 8 CFR
§§103.5(a)(1), (5), and 1003.23(b)(1), and the Executive always has dis-
cretion not to remove, see *AAADC*, 525 U. S., at 483–484.

# SUPREME COURT OF THE UNITED STATES

_____

No. 19–161

_____

## DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* VIJAYAKUMAR THURAISSIGIAM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 25, 2020]

JUSTICE THOMAS, concurring.

I join the Court's opinion, which correctly concludes that respondent's Suspension Clause argument fails because he does not seek a writ of habeas corpus. I write separately to address the original meaning of the Suspension Clause, which guarantees that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." Art. I, §9, cl. 2. The Founders appear to have understood "[t]he Privilege of the Writ of Habeas Corpus" to guarantee freedom from discretionary detention, and a "suspen[sion]" of that privilege likely meant a statute granting the executive the power to detain without bail or trial based on mere suspicion of a crime or dangerousness. Thus, the expedited removal procedure in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, 110 Stat. 3009–546, is likely not a suspension.[1]

I

The writ of habeas corpus began as a prerogative writ in the Court of King's Bench in the 16th century. J. Baker, An Introduction to English Legal History 157 (5th ed. 2019).

_____

[1] I express no view on the question whether respondent is even entitled to the privilege of the writ as an unadmitted alien.

Over time, however, it came to be understood both as a right
to be free from arbitrary detention and as a procedural writ.

By the end of the 16th century, the English connected the
common-law writ of habeas corpus to liberty.  Specifically,
it was associated with the guarantee in Magna Carta that
"[n]o free person (*Nullus liber homo*) shall be taken or im-
prisoned, or disseised or outlawed or exiled, or in any way
destroyed . . . except by the lawful judgment of his peers or
by the law of the land."  *Id.*, at 157, n. 76, 506.  Perhaps
most prominently, Edward Coke wrote in his Institutes
that "if a man be taken, or committed to prison *contra legem
terrae*, against the Law of the land," then "[h]e may have an
*habeas corpus*."  The Second Part of the Institutes of the
Laws of England 55 (6th ed. 1681).  For Coke, and for the
many English (and later Americans) who read his work,
"the writ was treated as an aspect of the Charter's guar-
anty."  D. Meador, Habeas Corpus and Magna Carta: Dual-
ism of Power and Liberty 22 (1966).

This association between habeas corpus and freedom
from discretionary detention deepened after 1679 with the
Habeas Corpus Act, also known as An Act for the better se-
cureing the Liberty of the Subject and for Prevention of Im-
prisonments beyond the Seas.  The statute sought to ad-
dress "great Delayes" in "criminall or supposed criminall
Matters."  31 Car. 2, ch. 2.  It required an officer served with
a writ of habeas corpus to produce the prisoner within three
days in "any such criminall or supposed criminall Matters."
*Ibid.*  It also guaranteed bail to prisoners in cases of felony
or high treason if they were not tried within one term of
court.  *Ibid.*  To protect these rights, Parliament created a
special statutory remedy: All writs under the Habeas Cor-
pus Act were marked as issuing pursuant to the statute.
*Ibid.*; P. Halliday, Habeas Corpus: From England to Empire
320 (2010).

Parliament passed the Habeas Corpus Act to curb the
power of King Charles II, but it nonetheless came to be seen

as a protection for liberty, not just an assertion of the powers of Parliament over the Crown. Henry Care, in the 1774 edition of his widely read treatise English Liberties, commented that "before this statute [the common-law writ of habeas corpus] was rendered far less useful than it ought to be, partly by the Judges pretending a power to grant or deny the said writ at their pleasure, in many cases; and especially by the ill practices of Sheriffs and Goalers, by putting the prisoner to the charge and trouble of . . . a second and third writ, before they would obey the first." 1 English Liberties, or the Free-born Subject's Inheritance 195. The Habeas Corpus Act, he concluded, "provides thus for our liberty." *Id.,* at 198. William Blackstone put it even more sweepingly, writing that the Habeas Corpus Act "is frequently considered as another *magna carta.*" 3 Commentaries on the Laws of England 135 (1770).

## II

The Founders inherited this understanding of habeas corpus. And they enshrined it in the Suspension Clause, which they understood to protect a substantive right.

The language of the Suspension Clause evinces this understanding. The Clause itself does not authorize courts to issue writs of habeas corpus. *INS* v. *St. Cyr*, 533 U. S. 289, 337 (2001) (Scalia, J., dissenting); *Ex parte Bollman*, 4 Cranch 75, 94 (1807). Nor does it refer simply to the writ of habeas corpus. Rather, it protects the *privilege of* the writ of habeas corpus. The word "privilege" was "used interchangeably with the words 'rights,' 'liberties,' and 'freedoms,' and had been since the time of Blackstone." *McDonald* v. *Chicago*, 561 U. S. 742, 813 (2010) (THOMAS, J., concurring in part and concurring in judgment). By using this term, the Framers appear to have had a substantive right in mind.

Ratification debates reflect this understanding as well. Future Supreme Court Justice James Iredell said in the

North Carolina convention that, "[b]y the privileges of the
*habeas corpus*, no man can be confined without inquiry; and
if it should appear that he has been committed contrary to
law, he must be discharged." 4 Debates in the Several State
Conventions 171 (J. Elliot ed. 1891). Signer of the Consti-
tution James McHenry told the Maryland House of Dele-
gates that "[p]ublic safety may require a suspension of the
Ha[beas] Corpus in cases of necessity: when those cases do
not exist, the virtuous Citizen will ever be protected in his
opposition to power." 11 Documentary History of the Rati-
fication of the Constitution 80, 84 (J. Kaminski et al. eds.
2015) (Documentary History).

    This understanding is echoed in statements that the Con-
stitution protects the Habeas Corpus Act, the writ of habeas
corpus, or simply "the habeas corpus," all referring to a sub-
stantive right. Alexander Hamilton wrote in The Federalist
No. 83 that "the *habeas corpus* act" was "provided for in the
most ample manner in the plan of the convention." The
Federalist No. 83, p. 499 (C. Rossiter ed. 1961). Again in
No. 84, he wrote that the Constitution "establish[ed] the
writ of *habeas corpus.*" *Id.*, No. 84, at 511. In the Pennsyl-
vania ratifying convention, Jasper Yeates said that the Sus-
pension Clause "direct[ed] that the privilege of the *habeas
corpus* act shall not be suspended except in times of imme-
diate danger." 2 Documentary History 434–435 (M. Jensen
ed. 1976). In Virginia, Governor Edmund Randolph—a
signer and future Attorney General—argued that "the ha-
beas corpus is at least on as secure and good a footing as it
is in England" because "[t]hat privilege is secured here by
the Constitution." 9 *id.*, at 1099 (J. Kaminski & G. Saladino
eds. 1990). Luther Martin of Maryland wrote that "the gen-
eral government is to have a *power* of *suspending* the *ha-
beas corpus act*, in cases of *rebellion* or *invasion.*" Genuine
Information VIII, reprinted in 15 *id.*, at 434 (J. Kaminski &
G. Saladino eds. 1984). In Massachusetts, Theophilius Par-
sons "made a Loud Speech on the Habeas Corpus act that

it will not be in the power of Gov[ern]ment to suspend the act only in time of war." 7 *id.*, at 1813 (J. Kaminski & G. Saladino eds. 2001). Other speakers and writers made similar references. See A. Tyler, Habeas Corpus in Wartime 132–133 (2017) (collecting examples). In sum, it seems that the founding generation viewed the privilege of the writ of habeas corpus as a freedom from arbitrary detention.[2]

## III

The remaining question is what it means for "[t]he Privilege of the Writ of Habeas Corpus" to "be suspended." U. S. Const., Art. I, §9, cl. 2. At the founding, suspension was a well-known term that meant "a [t]emporal [s]top of a [m]an's [r]ight." N. Bailey, An Universal Etymological English Dictionary (22d ed. 1770); see *St. Cyr*, 533 U. S., at 337–338 (Scalia, J., dissenting). In the context of habeas corpus,

---

[2] None of this is to say that the writ of habeas corpus involved a wide-ranging, ever-changing inquiry. As the Court today reaffirms, "the scope of habeas has been tightly regulated by statute, from the Judiciary Act of 1789 to the present day." *Ante*, at 21, n. 20. A writ of habeas corpus was "in the nature of a writ of error, to examine the legality of the commitment." *Ex parte Watkins*, 3 Pet. 193, 202 (1830) (Marshall, C. J.). When an executive detained someone without trial, it allowed a court to "examine into [the] validity" of "the reason for" commitment. 3 W. Blackstone, Commentaries on the Laws of England 133 (1770). In cases of detention pursuant to the judgment of a court, "a prisoner seeking a writ of habeas corpus could challenge only the jurisdiction of the court that had rendered the judgment under which he was in custody." *Wright* v. *West*, 505 U. S. 277, 285 (1992) (opinion of THOMAS, J.). In both contexts, the writ "played only a procedural role: It issued as of right when a prisoner showed probable cause to believe he was being held illegally . . . and obligated the warden to file a 'return' identifying the grounds of imprisonment." *Jennings* v. *Stephens*, 574 U. S. 271, 285 (2015) (THOMAS, J., dissenting). When the writ of habeas corpus was granted, it "decided nothing except that there was a case calling for an answer by the gaoler." Goddard, A Note on Habeas Corpus, 65 L. Q. Rev. 30, 34 (1949). "After reviewing the reason so returned, the court could release, bail, or remand the prisoner as appropriate." J. Baker, An Introduction to English Legal History 157 (5th ed. 2019).

it appears to have specifically meant a grant of authority to
the executive to detain without bail or trial based on suspi-
cion of a crime or dangerousness.

The English understood the term this way. Blackstone
called it "the happiness of [the English] constitution" that
"the parliament only, or legislative power, . . . can authorize
the crown, by suspending the *habeas corpus* act for a short
and limited time, to imprison suspected persons without
giving any reason for so doing." 1 Commentaries on the
Laws of England, at 136. Bills known as suspensions
granted broad power to detain based on suspicion of a
crime. For example, in 1777, Lord Germaine introduced a
bill "'to empower his Majesty to secure and detain Persons
charged with, or suspected of, the Crime of High Treason
committed in North America, or on the High Seas, or the
Crime of Piracy.'" 19 W. Cobbett, The Parliamentary His-
tory of England 4 (1814). The bill allowed certain prisoners
to be detained "'without bail or mainprize'"[3] and prohibited
any "'judge or justice of peace'" from "'bail[ing] or try[ing]
any such person or persons, . . . any law, statute, or usage,
to the contrary in any wise notwithstanding.'" *Id.,* at 5.
The text contained no mention of the Habeas Corpus Act,
but it nevertheless was referred to as a "suspension of the
Habeas Corpus Act." *Id.,* at 9–10. As one historian has
written, suspensions "were officially acts 'empowering his
majesty to apprehend and detain such persons as he shall
find cause to suspect'" and to do so "'without bail or
mainprise.'" Halliday, Habeas Corpus, at 248.

Americans shared a similar understanding, as evidenced
by the suspensions that States passed during the Revolu-
tionary War. "By their common terms," these suspensions

_____

[3] Mainprise or mainprize is a "writ ordering the sheriff to take . . . se-
curity . . . for the prisoner's appearance and release the prisoner."
Black's Law Dictionary 1142 (11th ed. 2019).

"bestowed authority on state executives to arrest and detain persons preventively based on suspicion of supporting the Crown." Tyler, Habeas Corpus in Wartime, at 111. In 1777, Massachusetts authorized the detention of "any person whom the council shall deem the safety of the Commonwealth requires should be restrained of his personal liberty, or whose enlargement within this state is dangerous thereto" "without bail or mainpri[s][z]e." 1776–1777 Mass. Acts ch. 45, §§1, 3, p. 641. Virginia similarly allowed the Governor and council to detain anyone "whom they may have just cause to suspect of disaffection to the independence of the United States or of attachment to their enemies." An act for giving certain powers to the governour and council, and for punishing those who shall oppose the execution of laws, reprinted in 10 W. Hening's Statutes at Large 413–414 (1822). And New York created a board with power "to apprehend and confine or cause to be apprehended or confined . . . all persons whose going at large shall in the judgment of the said commissioners or any three of them appear dangerous to the safety of this State." An Act appointing commissioners for detecting and defeating conspiracies and declaring their powers (Feb. 5, 1778), 1778 N. Y. Laws ch. 3, pp. 8–9; see also An Act for constituting a Council of Safety (Oct. 11, 1777), 1777 N. J. Laws ch. 40, §4, p. 85; An Act to Empower the Supreme Executive Council of this Commonwealth to Provide for the Security Thereof in Special Cases Where No Provision Is Already Made by Law (Sept. 6, 1777), ch. 762, §2, 9 Statutes at Large of Pennsylvania 140 (J. Mitchell & H. Flanders eds. 1903); An Act to punish certain crimes and misdemeanors, and to prevent the growth of toryism, 1777 Md. Laws ch. 20, §7.[4]

---

[4] It does not appear that it was necessary to expressly mention the availability of the writ in a suspending Act. Some States made express reference to the writ of habeas corpus, see, *e.g.,* ch. 762, §2, 9 Statutes at Large of Pennsylvania 140, but many did not.

Massachusetts continued using this formula for suspensions under its 1780 Constitution. These suspensions are especially probative because that Constitution contained language similar to the Federal Suspension Clause: "The privilege and benefit of the writ of habeas corpus shall be enjoyed in this Commonwealth in the most free, easy, cheap, expeditious and ample manner; and shall not be suspended by the Legislature, except upon the most urgent and pressing occasions, and for a limited time not exceeding twelve months." Pt. 2, ch. VI, Art. VII. In response to Shays' Rebellion, which gained notoriety across the United States, Massachusetts passed "An Act for Suspending the Privilege of the Writ of Habeas Corpus." It provided that

> "the Governor, with the advice and consent of the Council, be and he hereby is authorised and empowered . . . to command, and cause to be apprehended, and committed in any Goal, or other safe place, within the Commonwealth, any person or persons whatsoever, whom the Governor and Council, shall deem the safety of the Commonwealth requires should be restrained of their personal liberty, or whose enlargement is dangerous thereto; any Law, Usage or Custom to the contrary notwithstanding." 1786–1787 Mass. Acts ch. 41, p. 102.

The Act also provided that "any Person who shall be apprehended and imprisoned, as aforesaid, shall be continued in imprisonment, without Bail or Mainprize, until he shall be discharged therefrom by order of the Governor, or of the General Court." *Id.,* at 103; see also An Act to Suspend the Privilege of the Writ of Habeas Corpus for Six Months (June 27, 1782), 1782–1783 Mass. Acts ch. 2, pp. 6–7. Thus, in a jurisdiction with an analog to the Suspension Clause, a suspension was a grant of power to detain without bail or trial based on suspicion of a crime or dangerousness.

Although the ratification debates are not especially illuminating on the meaning of a suspension, they provide further support for this understanding. Luther Martin wrote that the Government, upon "suspending the habeas corpus act may *seize* upon the persons of those *advocates of freedom*, who have had *virtue* and *resolution* enough to excite the opposition, and may *imprison* them during its pleasure." Genuine Information VIII, reprinted in 15 Documentary History 434. Another essayist, writing in a Boston newspaper, explained that suspension would allow "the President, or President and Senate, as Congress shall think proper to empower, to take up and confine for any cause, or for any suspicion, or for no cause, perhaps any person, he or they shall think proper. 5 *id.*, at 712 (J. Kaminski & G. Saladino eds. 1998).

In sum, a suspension was not necessarily an express limitation on the availability of the writ of habeas corpus. Rather, it appears to have been a grant of power to detain based on suspicion of a crime or dangerousness without bail or trial.

IV

Under this interpretation, 8 U. S. C. §1252 likely does not suspend the writ of habeas corpus. To be placed in expedited removal, an immigration officer must "determin[e]" that an alien is "inadmissible." §1225(b)(1)(A)(i). That determination is based in part on the alien's lack of valid entry documentation and failure to satisfy a 2-year continuous physical presence requirement, not on mere suspicion or dangerousness. §§1225(b)(1)(A)(i), (iii)(II); §1182(a)(7). An alien has the opportunity to avoid expedited removal by demonstrating a "credible fear of persecution." §§1225(b)(1)(B)(iii), (v). If the alien is unsuccessful, he may seek "[j]udicial review . . . in habeas corpus proceedings" of "whether [he] is an alien"; "whether [he] was ordered removed" under expedited removal; and "whether [he] can

prove by a preponderance of the evidence that [he] is an alien lawfully admitted for permanent residence, has been admitted as a refugee . . . , or has been granted asylum" and "such status [has not] been terminated." §1252(e)(2).

This statute bears little resemblance to a suspension as that term was understood at the founding. It does not allow the executive to detain based on mere suspicion of a crime or dangerousness. Rather, it requires a finding that the detainee lacks valid documentation and is not eligible for asylum. It even expressly permits habeas relief for a detainee who does not meet certain criteria for expedited removal.

Some may wish that the Suspension Clause were broader. Perhaps for this reason, our precedents have departed from the original understanding of the Suspension Clause. See, *e.g.*, *Boumediene* v. *Bush*, 553 U. S. 723, 826–850 (2008) (Scalia, J., dissenting); *St. Cyr*, 533 U. S., at 336–341 (Scalia, J., dissenting). But this understanding does contain an important guarantee of individual liberty by limiting the circumstances in which Congress may give the executive power to detain without bail or trial based on suspicion of a crime or dangerousness. In this case, that guarantee has not been violated.

# SUPREME COURT OF THE UNITED STATES

---

No. 19–161

---

## DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* VIJAYAKUMAR THURAISSIGIAM

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2020]

JUSTICE BREYER, with whom JUSTICE GINSBURG joins, concurring in the judgment.

The statute at issue here, 8 U. S. C. §1252(e)(2), sets forth strict limits on what claims a noncitizen subject to expedited removal may present in federal habeas corpus proceedings. I agree that enforcing those limits *in this particular case* does not violate the Suspension Clause's constitutional command: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U. S. Const., Art. I, §9, cl. 2. But we need not, and should not, go further.

We need not go further because the Government asked us to decide, and we agreed to review, an issue limited to the case before us. The question presented is "whether, *as applied to respondent*, Section 1252(e)(2) is unconstitutional under the Suspension Clause." Pet. for Cert. i (emphasis added). All we must decide is whether, under the Suspension Clause, the statute at issue "is unconstitutional as applied to *this* party, in the circumstances of *this* case." *Chicago* v. *Morales*, 527 U. S. 41, 74 (1999) (Scalia, J., dissenting).

Nor should we go further. Addressing more broadly whether the Suspension Clause protects people challenging

removal decisions may raise a host of difficult questions in the immigration context. What review might the Suspension Clause assure, say, a person apprehended years after she crossed our borders clandestinely and started a life in this country? Under current law, noncitizens who have lived in the United States for up to two years may be placed in expedited-removal proceedings, see §1225(b)(1)(A)(iii), but Congress might decide to raise that 2-year cap (or remove it altogether). Does the Suspension Clause let Congress close the courthouse doors to a long-term permanent resident facing removal? In *INS* v. *St. Cyr*, 533 U. S. 289 (2001), we avoided just that "serious and difficult constitutional issue." *Id.*, at 305.

Could Congress, for that matter, deny habeas review to someone ordered removed despite claiming to be a natural-born U. S. citizen? The petitioner in *Chin Yow* v. *United States*, 208 U. S. 8 (1908), and others have faced that predicament. See also §1252(e)(2)(A) (permitting, at present, habeas review of citizenship claims). What about foreclosing habeas review of a claim that rogue immigration officials forged the record of a credible-fear interview that, in truth, never happened? Or that such officials denied a refugee asylum based on the dead-wrong legal interpretation that Judaism does not qualify as a "religion" under governing law? Cf. *Tod* v. *Waldman*, 266 U. S. 113, 119–120 (1924) (observing that immigration officials ignored a Jewish family's claim that they were "refugees" fleeing "religious persecution").

The answers to these and other "difficult questions about the scope of [Suspension Clause] protections" lurk behind the scenes here. *Lozman* v. *Riviera Beach*, 585 U. S. ___, ___ (2018) (slip op., at 10). I would therefore avoid making statements about the Suspension Clause that sweep beyond the principles needed to decide this case—let alone come to conclusions about the Due Process Clause, a distinct consti-

tutional provision that is not directly at issue here. Compare *ibid.* (concluding that, with narrow grounds for decision available, resolving broader, more difficult questions "must await a different case") with *ante*, at 12–16 (suggesting that removal is simply not the sort of "restraint" for which the Suspension Clause guarantees a means of "securing release"), and *ante*, at 34–36 (addressing a separate due process question).

As for the resolution of the dispute before us, Congress, in my view, had the constitutional power to foreclose habeas review of the claims that respondent has pressed in this case. Habeas corpus, as we have said, is an "adaptable remedy," and the "precise application and scope" of the review it guarantees may change "depending upon the circumstances." *Boumediene* v. *Bush*, 553 U. S. 723, 779 (2008); see also *id.*, at 813 (ROBERTS, C. J., dissenting). So where the Suspension Clause applies, the "habeas court's role" may prove more "extensive," or less so, depending on the context at issue. *Id.*, at 780 (majority opinion). Here, even assuming that the Suspension Clause guarantees respondent some form of habeas review—which is to say, even accepting for argument's sake that the relief respondent seeks *is* "release," contra, *ante*, at 22—the scope of that constitutionally required review would not extend to his claims. Two features of this case persuade me.

*First*, respondent's status suggests that the constitutional floor set by the Suspension Clause here cannot be high. A Border Patrol agent apprehended respondent just 25 yards inside the border. Respondent was placed in expedited removal proceedings shortly thereafter, where he received the same consideration for relief from removal that Congress has afforded persons arriving at the border. Respondent has never lived in, or been lawfully admitted to, the United States.

To my mind, those are among the "circumstances" that

inform the "scope" of any habeas review that the Suspension Clause might guarantee respondent. *Boumediene*, 553 U. S., at 779. He is thus in a materially different position for Suspension Clause purposes than the noncitizens in, for example, *Rowoldt* v. *Perfetto*, 355 U. S. 115 (1957), *United States ex rel. Accardi* v. *Shaughnessy*, 347 U. S. 260 (1954), *Bridges* v. *Wixon*, 326 U. S. 135 (1945), and *Hansen* v. *Haff*, 291 U. S. 559 (1934). They had all lived in this country for years. The scope of whatever habeas review the Suspension Clause assures respondent need not be as extensive as it might for someone in that position.

*Second*, our precedents demonstrate that respondent's claims are of the kind that Congress may, consistent with the Suspension Clause, make unreviewable in habeas proceedings. Even accepting respondent's argument that our "finality era" cases map out a constitutional minimum, see *ante*, at 23–24, his claims, on the facts presented here, differ significantly from those that we reviewed throughout this period.

To begin, respondent concedes that Congress may eliminate habeas review of factual questions in cases like this one. See, *e.g.*, *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 660 (1892). He has thus disclaimed the "right to challenge the historical facts" found by immigration officials during his credible-fear process. Tr. of Oral Arg. 44. But even though respondent has framed his two primary claims as asserting legal error, substance belies that label. Both claims are, at their core, challenges to factual findings.

During his credible-fear interview, respondent said that he is an ethnic Tamil from Sri Lanka and that, one day, a group of men abducted him in a van and brutally beat him. App. 67, 70–74. The asylum officer believed respondent's account, *id.*, at 83, which respondent confirmed was his sole basis for seeking relief, *id.*, at 77, 79. The critical question, then, concerned the nature of the attack: Who attacked respondent and why? In written findings, the asylum officer

concluded that it was "unknown who these individuals were or why they wanted to harm [respondent]." *Id.*, at 87. Based on those findings, the asylum officer determined that respondent had not established a credible fear of persecution or torture within the meaning of governing law. See *id.*, at 87, 89.

Respondent, to be sure, casts the brunt of his challenge to this adverse credible-fear determination as two claims of legal error. But it is the factual findings underlying that determination that respondent, armed with strong new *factual* evidence, now disputes. See *id.*, at 23–27; Brief for Professors of Sri Lankan Politics as *Amici Curiae* 7–11; see also *ante*, at 36, n. 28 (noting that immigration officials may revisit their findings in light of this additional evidence).

Respondent first asserts that the asylum officer failed to apply—or at least misapplied—the applicable legal standard under §1225(b)(1)(B)(v), which required only a "significant possibility" that respondent could establish entitlement to relief from removal. See App. 30–32; Brief for Respondent 6. Respondent also contends that the asylum officer "demonstrated a fatal lack of knowledge" about conditions in Sri Lanka, *id.*, at 7, in violation of provisions requiring that asylum officers consider "other facts as are known to the officer," §1225(b)(1)(B)(v), and have "had professional training in country conditions," §1225(b)(1)(E)(i). See App. 24–26, 28–29, 31.

At the heart of both purportedly legal contentions, however, lies a disagreement with immigration officials' findings about the two brute facts underlying their credible-fear determination—again, the identity of respondent's attackers and their motive for attacking him. Other than his own testimony describing the attack, respondent has pointed to nothing in the administrative record to support either of these claims.

As to his legal-standard claim, respondent does not cite anything affirmatively indicating that immigration officials

misidentified or misunderstood the proper legal standard
under §1225(b)(1)(B)(v). Rather, he argues that their cred-
ible-fear determination was so egregiously wrong that it
simply *must* have rested on such a legal error. See Tr. of
Oral Arg. 46–50. But that contention rests on a refusal to
accept the facts as found by the immigration officials. Spe-
cifically, it rejects their findings that no evidence suggested
respondent was attacked by men affiliated with the Sri
Lankan Government and motivated by respondent's Tamil
ethnicity or (as he now alleges) history of political activism.
See App. 87; see also, *e.g.*, *id.*, at 23–26. Respondent's quar-
rel, at bottom, is not with whether settled historical facts
satisfy a legal standard, see *Guerrero-Lasprilla* v. *Barr*, 589
U. S. ___, ___ (2020) (slip op., at 4), but with what the his-
torical facts *are*.

Respondent's country-conditions claim is much the same.
Respondent does not cite anything in the administrative
record affirmatively indicating that, contrary to
§§1225(b)(1)(B)(v) and (E)(i), immigration officials, for ex-
ample, consciously disregarded facts presented or other-
wise known to them, or that the asylum officer never re-
ceived relevant professional training. Instead, respondent
offers a similar refrain: The credible-fear determination
was so egregiously wrong that immigration officials simply
*must* not have known about conditions in Sri Lanka. See
Brief for Respondent 7. So this claim, too, boils down to a
factual argument that immigration officials should have
known who respondents' attackers were and why they at-
tacked him.

Mindful that the "Constitution deals with substance, not
shadows," *Salazar* v. *Buono*, 559 U. S. 700, 723 (2010)
(ROBERTS, C. J., concurring) (internal quotation marks
omitted), I accordingly view both claims as factual in na-
ture, notwithstanding respondent's contrary characteriza-
tion. For that reason, Congress may foreclose habeas re-
view of these claims without running afoul of the

Suspension Clause. See, *e.g.*, *Nishimura Ekiu*, 142 U. S., at 660.

The other two claims of error that respondent has pressed assert that immigration officials violated procedures required by law. He first contends that, by not asking additional questions during the credible-fear interview, the asylum officer failed to elicit "all relevant and useful information," in violation of 8 CFR §208.30(d) (2020). See App. 27, 31. Respondent further alleges that translation problems arose during the interview, in violation of the asylum officer's duty under §§208.30(d)(1) and (2) to ensure that respondent was "[a]ble to participate effectively" and "ha[d] an understanding of the credible fear determination process." See App. 27–28, 31. Though both claims may reasonably be understood as procedural, they may constitutionally be treated as unreviewable—at least under the border-entry circumstances present in this case. See *supra,* at 3–4.

Respondent's procedural claims are unlike those that we reviewed in habeas proceedings during the finality era. Throughout that period, the procedural claims that we addressed asserted errors that fundamentally undermined the efficacy of process prescribed by law. See *Chin Yow*, 208 U. S., at 11 (observing that a noncitizen could obtain habeas relief on procedural grounds if he was denied "an opportunity to prove his right to enter the country, as the statute meant that he should have"). Many of our finality era cases thus dealt with situations in which immigration officials failed entirely to take obligatory procedural steps.

In *Waldman*, for example, we faulted immigration officials for making "no finding[s]" at all on potentially dispositive issues, including whether the noncitizens were fleeing religious persecution and therefore exempt from a literacy requirement. 266 U. S., at 120. And in *United States ex rel. Johnson* v. *Shaughnessy*, 336 U. S. 806 (1949), we reversed for procedural error because the noncitizen was

denied outright "the independent [medical] review and re-examination" required by then-governing law. *Id.*, at 812; see also *Accardi*, 347 U. S., at 267 (faulting the Attorney General for short-circuiting altogether legally prescribed adjudication procedures by "dictating" an immigration decision himself).

Respondent's procedural claims are different. He does not allege that immigration officials, say, denied him a credible-fear interview or skipped a layer of intra-agency review altogether. Nor do his allegations suggest that the asylum officer's questioning or the interpreter's translation constructively deprived him of the opportunity to establish a credible fear; indeed, he has consistently maintained that the information that *was* elicited more than sufficed. See, *e.g.*, Tr. of Oral Arg. 46–48; cf. *Chin Yow*, 208 U. S., at 13 (observing that "the denial of a hearing cannot be established" merely "by proving that the decision was wrong"). Respondent thus contends that the credible-fear process was procedurally defective for reasons that are more technical. He alleges that additional questions would have yielded further "relevant and useful" information and that "communication issues affected the interview" in some way. App. 27.

Respondent's procedural claims consequently concern not the outright denial (or constructive denial) of a process, but the precise way in which the relevant procedures were administered. They raise fine-grained questions of degree— *i.e.*, whether the asylum officer made *sufficiently thorough* efforts to elicit all "relevant and useful information" and whether he took *sufficiently thorough* precautions to ensure that respondent was "[a]ble to participate effectively" in the interview. 8 CFR §208.30(d).

Reviewing claims hinging on procedural details of this kind would go beyond the traditionally "limited role" that habeas has played in immigration cases similar to this one—even during the finality era. *St. Cyr*, 533 U. S., at 312.

To interpret the Suspension Clause as insisting upon ha-
beas review of these claims would require, by constitutional
command, that the habeas court make indeterminate and
highly record-intensive judgments on matters of degree.
Respondent has not cited, and I have not found, any case of
ours suggesting that the Suspension Clause demands pars-
ing procedural compliance at so granular a level. Neither,
apparently, has the Solicitor General. See Tr. of Oral Arg.
14–15, 23–24; Brief for Petitioners 38.

Together with respondent's status, see *supra*, at 3–4,
these characteristics convince me that Congress had the
constitutional power to foreclose habeas review of respond-
ent's procedural claims. Recasting those claims as an alle-
gation that respondent's "due process rights were violated
by" immigration officials makes no material difference.
App. 32. That alternative description changes none of the
features that, in my view, put respondent's procedural
claims beyond the scope of any minimum habeas review
that the Suspension Clause might assure him under the cir-
cumstances.

\*  \*  \*

For these reasons, I would hold that, as applied to re-
spondent, §1252(e)(2)'s limits on habeas review do not vio-
late the Suspension Clause. I would go no further.

# SUPREME COURT OF THE UNITED STATES

———————

No. 19–161

———————

## DEPARTMENT OF HOMELAND SECURITY, ET AL., PETITIONERS *v.* VIJAYAKUMAR THURAISSIGIAM

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 25, 2020]

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN joins, dissenting.

The majority declares that the Executive Branch's denial of asylum claims in expedited removal proceedings shall be functionally unreviewable through the writ of habeas corpus, no matter whether the denial is arbitrary or irrational or contrary to governing law. That determination flouts over a century of this Court's practice. In case after case, we have heard claims indistinguishable from those respondent raises here, which fall within the heartland of habeas jurisdiction going directly to the origins of the Great Writ.

The Court thus purges an entire class of legal challenges to executive detention from habeas review, circumscribing that foundational and "stable bulwark of our liberties," 1 W. Blackstone, Commentaries 99 (Am. ed. 1832). By self-imposing this limitation on habeas relief in the absence of a congressional suspension, the Court abdicates its constitutional duty and rejects precedent extending to the foundations of our common law.

Making matters worse, the Court holds that the Constitution's due process protections do not extend to noncitizens like respondent, who challenge the procedures used to determine whether they may seek shelter in this country or

whether they may be cast to an unknown fate. The decision
deprives them of any means to ensure the integrity of an
expedited removal order, an order which, the Court has just
held, is not subject to any meaningful judicial oversight as
to its substance. In doing so, the Court upends settled con-
stitutional law and paves the way toward transforming al-
ready summary expedited removal proceedings into arbi-
trary administrative adjudications.

Today's decision handcuffs the Judiciary's ability to per-
form its constitutional duty to safeguard individual liberty
and dismantles a critical component of the separation of
powers. It will leave significant exercises of executive dis-
cretion unchecked in the very circumstance where the
writ's protections "have been strongest." *INS* v. *St. Cyr*, 533
U. S. 289, 301 (2001). And it increases the risk of erroneous
immigration decisions that contravene governing statutes
and treaties.

The Court appears to justify its decision by adverting to
the burdens of affording robust judicial review of asylum
decisions. But our constitutional protections should not
hinge on the vicissitudes of the political climate or bend to
accommodate burdens on the Judiciary. I respectfully dis-
sent.

I

The as-applied challenge here largely turns on how the
Court construes respondent's requests for relief. Its de-
scriptions, as well as those of one of the concurrences, skew
the essence of these claims. A proper reframing thus is in
order.

A

Respondent first advances a straightforward legal ques-
tion that courts have heard in habeas corpus proceedings in
"case after case." *Id.*, at 306. His habeas petition claimed
that an asylum officer and Immigration Judge "appl[ied] an

incorrect legal standard" by ordering him removed despite a showing of a significant possibility of credible fear to establish "eligibility for asylum, withholding of removal, and [Convention Against Torture] claims." App. 31–32; see also 8 U. S. C. §1225(b)(1)(B)(v) (setting standard for credible fear as "a significant possibility, taking into account the . . . statements made by the alien . . . and such other facts as are known to the officer, that the alien could establish eligibility for asylum"). The Government itself has characterized that claim as a challenge to the "'application of a legal standard to factual determinations . . . underlying the Executive's negative credible-fear findings.'" 917 F. 3d 1097, 1117, n. 20 (CA9 2019) (case below). At bottom, respondent alleged that he was unlawfully denied admission under governing asylum statutes and regulations.

The Court disagrees, flattening respondent's claim into a mere plea "ultimately to obtain authorization to stay in this country." *Ante*, at 2; see also *ante*, at 12 (describing the request as a "right to enter or remain in a country"); *ante*, at 13, n. 14 (framing relief sought as "gaining a right to remain in this country"); *ante*, at 16 (equating relief with "authorization . . . to remain in a country other than his own"). Yet while the Court repeatedly says that respondent seeks nothing more than admission as a matter of grace, its own descriptions of respondent's habeas petition belie its assertions. See, *e.g.*, *ante*, at 5, n. 5 ("[T]he gravamen of his petition is that [respondent] faces persecution in Sri Lanka 'because of' his Tamil ethnicity and political opinions"); *ibid.* (suggesting that the same persecution inquiry governs respondent's Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment claim); *ante*, at 36, n. 28 (observing that respondent's habeas petition contains factual allegations that resemble documented persecution on the basis of ethnicity or political opinion). Though the Court refuses to admit as much, its descriptions of respondent's arguments illustrate, at bottom, claims that

immigration officials legally erred in their review of his asylum application.

In papering over the true nature of respondent's claims, the Court transforms his assertions of legal error in the exercise of executive discretion into a naked demand for executive action. But the distinction between those forms of relief makes all the difference. The law has long permitted habeas petitioners to challenge the legality of the exercise of executive power, even if the executive action ultimately sought is discretionary. See *St. Cyr*, 533 U. S., at 307 (citing cases). That principle has even more force today, where an entire scheme of statutes and regulations cabins the Executive's discretion in evaluating asylum applications. For that reason, the Court's observation that the ultimate "grant of asylum is discretionary" is beside the point. *Ante*, at 5, n. 4.

For its part, one concurring opinion seems to acknowledge that claims that assert something other than pure factual error may constitutionally require some judicial review. *Ante*, at 3–5 (BREYER, J., concurring in judgment). It simply determines that respondent's credible-fear claims amount to nothing more than a "disagreement with immigration officials' findings about the two brute facts underlying their credible-fear determination," namely, the identity of his attackers and their motivations. *Ante*, at 5. It also faults respondent for failing to develop his claims of legal error with citations "indicating that immigration officials misidentified or misunderstood the proper legal standard" or that they "disregarded" or were not properly trained in identifying relevant country conditions. *Ante,* at 5–6.

But the essence of respondent's petition is that the facts as presented (that he, a Tamil minority in Sri Lanka, was abducted by unidentified men in a van and severely beaten), when considered in light of known country conditions (as required by statute), amount at least to a "significant possibility" that he could show a well-founded fear of

persecution. So viewed, respondent's challenge does not quibble with historic facts, but rather claims that those "settled facts satisfy a legal standard," which this Court has held amounts to a "legal inquiry." *Guerrero-Lasprilla* v. *Barr*, 589 U. S. \_\_\_, \_\_\_ (2020) (slip op., at 4). The concurring opinion suggests that any conclusions drawn from the discrete settled facts here could not be "so egregiously wrong" as to amount to legal error. *Ante,* at 6. But the ultimate inquiry is simply whether the facts presented satisfy a statutory standard. While this concurring opinion may believe that the facts presented here do not show that respondent is entitled to relief, its view of the merits does not alter the legal nature of respondent's challenge.

## B

Second, respondent contended that the inadequate procedures afforded to him in his removal proceedings violated constitutional due process. Among other things, he asserted that the removal proceedings by design did not provide him a meaningful opportunity to establish his claims, that the translator and asylum officer misunderstood him, and that he was not given a "reasoned explanation" for the decision. App. 27, 32; see also *id.*, at 32 (arguing that "[u]nder constitutionally adequate procedures, [respondent] would have prevailed on his claims"). Again, however, the Court falls short of capturing the procedural relief actually requested. The Court vaguely suggests that respondent merely wanted more cracks at obtaining review of his asylum claims, not that he wanted to challenge the existing expedited removal framework or the process actually rendered in his case as constitutionally inadequate. See *ante*, at 2 (characterizing respondent as asking for "additional administrative review of his asylum claim"); see also *ante*, at 5, n. 5 (describing petition as seeking "another opportunity to apply for asylum"). That misconstrues respond-

ent's procedural challenges to the expedited removal pro-
ceedings, which matters crucially; a constitutional chal-
lenge to executive detention is just the sort of claim the com-
mon law has long recognized as cognizable in habeas.  See
generally Part II, *infra.*

One concurring opinion, meanwhile, properly character-
izes respondent's claims on this score as "procedural" chal-
lenges.  *Ante*, at 7 (opinion of BREYER, J.).  Yet it concludes
that those claims are not reviewable because they do not
allege sufficiently serious defects.  See *ante*, at 7–8 (describ-
ing cognizable claims as those involving "'no [factual] find-
ing[s],'" contentions that officials "skipped a layer of intra-
agency review altogether," the "outright denial (or construc-
tive denial) of a process," or an official's "fail[ure] entirely
to take obligatory procedural steps").  But these are simply
distinctions of degree, not of kind.  Respondent claimed that
officials violated governing asylum regulations and de-
prived him of due process by conducting an inadequate in-
terview and providing incomplete translation services.  It is
difficult to see the difference between those claims and the
ones that the concurring opinion upholds as cognizable.  Cf.
*ante*, at 7–8 (finding cognizable claims that an official
"short-circuit[ed] altogether legally prescribed adjudication
procedures by 'dictating' an immigration decision" and that
an official deprived a noncitizen of "'an opportunity to prove
his right to enter the country, as the statute meant that he
should have'").

Indeed, the concurring opinion notes that the core ques-
tion is whether a defect "fundamentally undermined the ef-
ficacy of process prescribed by law."  *Ante*, at 7.  Respond-
ent's petition plainly posits procedural defects that violate,
or at least call into question, the "efficacy of process pre-
scribed by law" and the Constitution.  *Ibid.*  The concurring
opinion might think that respondent is not entitled to addi-
tional protections as a matter of law or that the facts do not
show he was denied any required process.  But conclusions

about the merits of respondent's procedural challenges should not foreclose his ability to bring them in the first place.

### C

Finally, the Court asserts that respondent did not specifically seek "release" from custody in what the Court styles as the "traditional" sense of the term as understood in habeas jurisprudence. *Ante*, at 10, 13; cf. *ante*, at 14 (suggesting that respondent "does not claim an entitlement to release"). Instead, the Court seems to argue that respondent seeks only a peculiar form of release: admission into the United States or additional asylum procedures that would allow for admission into the United States. Such a request, the Court implies, is more akin to mandamus and injunctive relief. *Ante*, at 13.

But it is the Court's directionality requirement that bucks tradition. Respondent asks merely to be freed from wrongful executive custody. He asserts that he has a credible fear of persecution, and asylum statutes authorize him to remain in the country if he does. That request is indistinguishable from, and no less "traditional" than, those long made by noncitizens challenging restraints that prevented them from otherwise entering or remaining in a country not their own. See Part II–B–1, *infra.*

The Court has also never described "release" as the sole remedy of the Great Writ. Nevertheless, respondent's petition is not limited in the way the Court claims. As it acknowledges, *ante*, at 10, respondent directly asked the District Court to "[i]ssue a writ of habeas corpus" without further limitation on the kind of relief that might entail, App. 33. Respondent also sought "an [o]rder directing [the Government] to show cause why the writ should not be granted" and an order "directing [the Government] to vacate the expedited removal order entered against [him]." *Ibid.* As the petition's plain language indicates, respondent

raised a garden-variety plea for habeas relief in whatever
form available and appropriate, including, but not limited
to, release.

\*     \*     \*

Fairly characterized, respondent's claims allege legal er-
ror (for violations of governing asylum law and for viola-
tions of procedural due process) and an open-ended request
for habeas relief.  It is "uncontroversial" that the writ en-
compasses such claims.  See *Boumediene* v. *Bush*, 553 U. S.
723, 779 (2008) (concluding that release is but one form of
relief available); see also *St. Cyr.*, 533 U. S., at 302, 304–
308 (citing cases predating the founding to show that the
writ could challenge "the erroneous application or interpre-
tation" of relevant law); see also Part II–D, *infra.*

## II

Only by recasting respondent's claims and precedents
does the Court reach its decision on the merits.  By its ac-
count, none of our governing cases, recent or centuries old,
recognize that the Suspension Clause guards a habeas right
to the type of release that respondent allegedly seeks.[1]

---

[1] The Court wisely declines to explore whether the Suspension Clause
independently guarantees the availability of the writ or simply restricts
the temporary withholding of its operation, a point of disagreement be-
tween the majority and dissent in *INS* v. *St. Cyr*, 533 U. S. 289 (2001).
*Ante*, at 11, n. 12. Justice Scalia, dissenting in *St. Cyr*, wrote that the
Suspension Clause "does not guarantee any content to (or even the exist-
ence of ) the writ of habeas corpus, but merely provides that the writ shall
not (except in case of rebellion or invasion) be suspended."  533 U. S., at
337.  But no majority of this Court, at any time, has adopted that theory.
Notably, moreover, even Justice Scalia appears to have abandoned his
position just three years later in *Hamdi* v. *Rumsfeld*, 542 U. S. 507, 555–
556 (2004) (dissenting opinion) ("The two ideas central to Blackstone's
understanding—due process as the right secured, and habeas corpus as
the instrument by which due process could be insisted upon by a citizen
illegally imprisoned—found expression in the Constitution's Due Process
and Suspension Clauses"); see also *id.*, at 558 ("The writ of habeas corpus

*Ante*, at 13, n. 14 (finding no evidence that the writ was understood in 1789 to grant relief that would amount to "gaining a right to remain in this country"); *ante*, at 13 (characterizing a "'meaningful opportunity'" for review of asylum claims as falling outside of traditional notions of release from custody). An overview of cases starting from the colonial period to the present reveals that the Court is incorrect, even accepting its improper framing of respondent's claims.

## A

The critical inquiry, the Court contends, is whether respondent's specific requests for relief (namely, admission into the United States or additional asylum procedures allowing for admission into the United States) fall within the scope of the kind of release afforded by the writ as it existed in 1789. *Ante*, at 11, 12; see also *ante*, at 10 (criticizing the court below for holding §1252(e)(2) unconstitutional "without citing any pre-1789 case about the scope of the writ"). This scope, it explains, is what the Suspension Clause protects "at a minimum." *Ante*, at 11. But as the Court implicitly acknowledges, its inquiry is impossible. The inquiry also runs headlong into precedent, which has never demanded the kind of precise factual match with pre-1789 case law that today's Court demands.

To start, the Court recognizes the pitfalls of relying on pre-1789 cases to establish principles relevant to immigration and asylum: "At the time, England had nothing like modern immigration restrictions." *Ante*, at 18–19 ("As late as 1816, the word 'deportation' apparently 'was not to be found in any English dictionary'"). It notes, too, that our

––––––––––

was preserved in the Constitution—the only common-law writ to be explicitly mentioned"). Even one concurring opinion seems to recognize that the Suspension Clause "protect[s] a substantive right." *Ante*, at 3–4 (opinion of THOMAS, J.).

cases have repeatedly observed the relative novelty of im-
migration laws in the early days of this country. *Ante*, at
20 (citing *Harisiades* v. *Shaughnessy*, 342 U. S. 580, 588, n.
15 (1952) ("An open door to the immigrant was the early
federal policy"); *St. Cyr*, 533 U. S., at 305 (remarking that
the first immigration regulation was enacted in 1875)); see
also *Demore* v. *Kim*, 538 U. S. 510, 539 (2003) (O'Connor, J.,
concurring in part and concurring in judgment) ("Because
colonial America imposed few restrictions on immigration,
there is little case law prior to that time about the availa-
bility of habeas review to challenge temporary detention
pending exclusion or deportation").

The Court nevertheless seems to require respondent to
engage in an exercise in futility. It demands that respond-
ent unearth cases predating comprehensive federal immi-
gration regulation showing that noncitizens obtained re-
lease from federal custody onto national soil. But no federal
statutes at that time spoke to the permissibility of their en-
try in the first instance; the United States lacked a compre-
hensive asylum regime until the latter half of the 20th cen-
tury. Despite the limitations inherent in this exercise, the
Court appears to insist on a wealth of cases mirroring the
precise relief requested at a granular level; nothing short of
that, in the Court's view, would demonstrate that a nonciti-
zen in respondent's position is entitled to the writ. See
*ante*, at 18, n. 18 (dismissing respondent's cited cases on the
ground that "[w]hether the founding generation understood
habeas relief more broadly than described by Blackstone,
Justice Story, and our prior cases . . . cannot be settled by a
single case or even a few obscure and possibly aberrant
cases"); see also Neuman, Habeas Corpus, Executive Deten-
tion, and the Removal of Aliens, 98 Colum. L. Rev. 961
(1998) (noting the inherent difficulties of a strict originalist
approach in the habeas context because of, among other
things, the dearth of reasoned habeas decisions at the
founding).

But this Court has never rigidly demanded a one-to-one match between a habeas petition and a common-law habeas analog. In *St. Cyr*, for example, the Court considered whether a noncitizen with a controlled substance conviction could challenge on habeas the denial of a discretionary waiver of his deportation order. 533 U. S., at 293. In doing so, the Court did not search high and low for founding-era parallels to waivers of deportation for criminal noncitizens. It simply asked, at a far more general level, whether habeas jurisdiction was historically "invoked on behalf of noncitizens . . . in the immigration context" to "challenge Executive . . . detention in civil cases." *Id.*, at 302, 305. That included determining whether "[h]abeas courts . . . answered questions of law that arose in the context of discretionary relief" (including questions regarding the allegedly "erroneous application or interpretation of statutes"). *Id.*, at 302, and n. 18, 307.

*Boumediene* is even clearer that the Suspension Clause inquiry does not require a close (much less precise) factual match with historical habeas precedent. There, the Court concluded that the writ applied to noncitizen detainees held in Guantanamo, 553 U. S., at 771, despite frankly admitting that a "[d]iligent search by all parties reveal[ed] no certain conclusions" about the relevant scope of the common-law writ in 1789, *id.*, at 746. Indeed, the Court reasoned that none of the cited cases illustrated whether a "common-law court would or would not have granted . . . a petition for a writ of habeas corpus" like that brought by the noncitizen-detainee petitioners, and candidly acknowledged that "the common-law courts simply may not have confronted cases with close parallels." *Id.*, at 746, 752. But crucially, the Court declined to "infer too much, one way or the other, from the lack of historical evidence on point." *Id.*, at 752. Instead, it sought to find comparable common-law habeas cases by "analogy." *Id.*, at 748–752.

There is no squaring the Court's methodology today with

*St. Cyr* or *Boumediene.*   As those cases show, requiring
near-complete equivalence between common-law habeas
cases and respondent's habeas claim is out of step with this
Court's longstanding approach in immigration cases.

## B

### 1

Applying the correct (and commonsense) approach to de-
fining the Great Writ's historic scope reveals that respond-
ent's claims have long been recognized in habeas.

Respondent cites *Somerset* v. *Stewart*, Lofft. 1, 98 Eng.
Rep. 499 (K. B. 1772), as an example on point.   There, Lord
Mansfield issued a writ ordering release of a slave bound
for Jamaica, holding that there was no basis in English law
for "sending . . . him over" to another country.   *Id.*, at 17–
19, 98 Eng. Rep., at 509–510.   Thus, the writ issued even
though it "did not free [the] slave so much as it protected
him from deportation."   P. Halliday, Habeas Corpus: From
England to Empire 175 (2010).   *Somerset* establishes the
longstanding availability of the writ to challenge the legal-
ity of removal and to secure release into a country in which
a petitioner sought shelter.   Scholarly discussions of *Mur-
ray's Case* suggest much of the same.   There, the King's
Bench granted habeas to allow a nonnative to remain in
England and to prevent his removal to Scotland for trial.
Halliday, Habeas Corpus, at 236.

The Court dismisses these examples outright.   It
acknowledges that the petitioner in *Somerset* may have
been allowed to remain in England because of his release
on habeas, yet declares that this was "due not to the wri[t]
ordering [his] release" but rather to the existing state of the
law.   *Ante*, at 20.   But the writ clearly did more than permit
the petitioner to disembark from a vessel; it prevented him
from being "sen[t] . . . over" to Jamaica.   Lofft., at 17, 98
Eng. Rep., at 509.   What England's immigration laws might
have prescribed after the writ's issuance did not bear on the

availability of the writ as a means to remain in the country in the first instance.

The Court also casts aside the facts of *Murray's Case*, even though they, too, reveal that habeas was used to permit a nonnative detainee to remain in a country. *Ante*, at 18, n. 18. The Court minimizes the decision as "obscure and possibly aberrant." *Ibid.* But given the relative paucity of habeas cases from this era, it is telling that the case serves as another example of the writ being used to allow a noncitizen to remain in England.[2]

The reasoning of *Somerset* and *Murray's Case* carried over to the Colonies, where colonial governments presumed habeas available to noncitizens to secure their residence in a territory. See generally Oldham & Wishnie, The Historical Scope of Habeas Corpus and *INS* v. *St. Cyr*, 16 Geo. Immigration L. J. 485 (2002). For example, in 1755, British authorities sought to deport French Acadian settlers from Nova Scotia, then under the control of Great Britain, to the American Colonies. *Id.*, at 497. The Governor and Assembly of South Carolina resisted the migrants' arrival and detained them in ships off the coast of Charleston. They recognized, however, that the exclusion could not persist because the migrants would be entitled to avail themselves of habeas corpus. *Id.*, at 498. Ultimately, the Governor released most of the Acadian migrants for resettlement throughout the Colony. *Ibid.*

Founding era courts accepted this view of the writ's scope. Rather than credit these decisions, the Court marches

―――――――

[2] The Court notes "the 'delicate' relationship between England and Scotland at the time" of *Murray's Case. Ante*, at 18, n. 18. Interestingly, the Court does not mention the delicate nature of the relationship between the United States and Iraq in *Munaf* v. *Geren*, 553 U. S. 674 (2008), the centerpiece of the Court's argument, even though that case arose during a military conflict. *Ante*, at 14–15. Nor does it acknowledge the impact that the relationship had on the *Munaf* Court's decision to refrain from issuing the writ. See Part II–B–3, *infra.*

through an assorted selection of cases and throws up its
hands, contending that the case law merely reflects a wide
range of circumstances for which individuals were deprived
of their liberty. See *ante*, at 16–17. Thus, the Court con-
cludes, the common law simply did not speak to whether
individuals could seek "release" that would allow them to
enter a country (as opposed to being expelled from it).

At the same time, notwithstanding its professed keen in-
terest in precedent, the Court seems to discount decisions
supporting respondent's view that habeas permitted re-
lease from custody into the country. At least two other clas-
ses of cases demonstrate that the writ was available from
around the founding onward to noncitizens who were de-
tained, and wanted to remain, including those who were
prevented from entering the United States at all.

First, common-law courts historically granted the writ to
discharge deserting foreign sailors found and imprisoned in
the United States. In *Commonwealth* v. *Holloway*, 1 Serg.
& Rawle 392 (1815), the Pennsylvania Supreme Court
granted a writ of habeas corpus to a Danish sailor who had
deserted his vessel in violation of both an employment con-
tract and Danish law. The court explained that the deser-
tion did not violate any domestic law or treaty, and thus
imprisonment was inappropriate. *Id.*, at 396 (opinion of
Tilghman, C. J.). By ordering an unconditional discharge
and declining to return the noncitizen sailor to the custody
of any foreign power, the court used the writ to order a re-
lease that authorized a noncitizen to remain in the United
States, a country "other than his own." *Ante*, at 16. The
same was true in similar cases that even the Court cites.
See *ante*, at 19 (citing *Case of the Deserters from the British
Frigate L'Africaine*, 3 Am. L. J. & Misc. Repertory 132 (Md.
1810) (reporting on a decision discharging deserters); *Case
of Hippolyte Dumas*, 2 Am. L. J. & Misc. Repertory 86 (Pa.
1809) (same)).

Curiously, the Court does not contest that the writs in

these cases were used to secure the liberty of foreign sailors, and consequently their right to enter the country.[3]  Rather, it remarks that judges at the time "chafed at having to order even release," *ante*, at 19, which some saw as inconsistent with principles of comity, *Holloway*, 1 Serg. & Rawle, at 394.  But reluctance is not inability.  That those judges followed the law's dictates despite their distaste for the result should give today's Court pause.

The Court seizes on one case where a court ordered a deserting sailor to be returned to his foreign vessel-master. See *ante*, at 14, 19 (citing *Ex parte D'Olivera*, 7 F. Cas. 853, 854 (No. 3,967) (CC Mass. 1813)).  But it reads too much into this one decision.  In *D'Olivera*, the court held that deserting sailors were unlawfully confined and granted a writ of habeas corpus, but directed that they be discharged to their vessel-master out of "a desire not to encourage desertion among foreign seamen." *Id.*, at 854.  As illustrated by other deserter cases *supra,* the kind of results-oriented decisionmaking in *D'Olivera* does not seem to be the norm. The Court's proclamation about how the scope of common-law habeas cannot hinge on a "single case" should have equal force here.  *Ante*, at 18, n. 18.

Next, courts routinely granted the writ to release wrongfully detained noncitizens into Territories other than the detainees' "own."  Many involved the release of fugitive or former slaves outside their home State.  In these cases, courts decided legal questions as to the status of these petitioners.  In *Arabas* v. *Ivers*, 1 Root 92 (Conn. Super. Ct. 1784), for example, a Connecticut court determined that a former slave from New York held in local jail on his alleged master's instructions had, in fact, been freed through his service in the Continental Army.  The court ordered him

————————

[3] Indeed, the Court highlights a striking similarity to the present asylum challenge by observing that the foreign-deserter cases show the "use of habeas to secure release from custody when not in compliance with . . . statute[s] and relevant treaties." *Ante*, at 21.

discharged "upon the ground that he was a freeman, abso-
lutely manumitted from his master by enlisting and serving
in the army." *Id.*, at 93. See also *In re Belt*, 7 N. Y. Leg.
Obs. 80 (1848) (granting habeas to discharge an imprisoned
fugitive slave whose owner did not timely apply for his re-
turn to Maryland); *In re Ralph*, 1 Morris 1 (Iowa 1839) (dis-
charging person from custody on the grounds that he was
not a fugitive slave subject to return to Missouri when he
had been allowed to travel to the Iowa Territory by his for-
mer master); *Commonwealth* v. *Holloway*, 2 Serg. & Rawle
305 (Pa. 1816) (holding on habeas corpus that a child born
in a free State to a slave was free); *In re Richardson's Case*,
20 F. Cas. 703 (No. 11,778) (CC DC 1837) (ordering prisoner
to be discharged in the District of Columbia because war-
rant was insufficient to establish that he was a runaway
slave from Maryland); *Commonwealth* v. *Griffith*, 19 Mass.
11 (1823) (contemplating that the status of a freeman seized
in Massachusetts as an alleged fugitive from Virginia could
be determined on habeas corpus).

The weight of historical evidence demonstrates that com-
mon-law courts at and near the founding granted habeas to
noncitizen detainees to enter Territories not considered
their own, and thus ordered the kind of release that the
Court claims falls outside the purview of the common-law
writ.

The Court argues that none of this evidence is persuasive
because the writ could not be used to compel authorization
to enter the United States. *Ante*, at 20. But that analogy
is inapt. Perhaps if respondent here sought to use the writ
to grant naturalization, the comparison would be closer.
But respondent sought only the proper interpretation and
application of asylum law (which statutorily permits him to
remain if he shows a credible fear of persecution), or in the
alternative, release pursuant to the writ (despite being cog-
nizant that he could be denied asylum or rearrested upon
release if he were found within the country without legal

authorization). But that consequence does not deprive respondent of the ability to invoke the writ in the first instance. See, *e.g.*, *Lewis* v. *Fullerton*, 22 Va. 15 (1821) (affirming that a judgment on habeas corpus in favor of a slave was not conclusive of her rights but merely permitted release from custody on the record before the court and did not prohibit recapture by a master); *Ralph*, 1 Morris, at 1 (noting that an adjudication that petitioner was not a fugitive only exempted him from fugitive-slave laws but did not prohibit master from entering Territory to reclaim him on his own accord).

For these reasons, the Court is wrong to dispute that common-law habeas practice encompassed the kind of release respondent seeks here.

2

The Court also appears to contend that respondent sought merely additional procedures in his habeas adjudication and that this kind of relief does not fall within the traditional scope of the writ. That reflects a misunderstanding of the writ. Habeas courts regularly afforded the state additional opportunities to show that a detention was lawful before ordering what the Court now considers a release outright.

The common-law writ of *habeas corpus ad subjiciendum* evolved into what we know and hail as the "Great Writ." See 3 W. Blackstone, Commentaries on the Laws of England 131 (1768). That writ, at bottom, allowed a court to elicit the cause for an individual's imprisonment and to ensure that he be released, granted bail, or promptly tried. See Oaks, Habeas Corpus in the States—1776–1865, 32 U. Chi. L. Rev. 243, 244 (1965). From its origins, the writ did not require immediate release, but contained procedures that would allow the state to proceed against a detainee. Under the English Habeas Corpus Act of 1679, jailers were ordered to make a "return" to a writ within a designated

time period and certify the true causes of imprisonment.
*Id.*, at 252–253. Justices of the King's Bench obtained re-
turns that provided full legal accounts justifying detention.
Halliday & White, The Suspension Clause: English Text,
Imperial Contexts, and American Implications, 94 Va.
L. Rev. 575, 599–600 (2008) (Halliday & White). They also
examined and were guided by depositions upon which a de-
tention was founded to determine whether to admit a peti-
tioner to bail. Oaks, 32 U. Chi. L. Rev., at 258. Indeed, the
King's Bench routinely considered facts not asserted in the
return to assist scrutiny of detentions. Halliday & White
610; see also *id.*, at 611 (documenting instances where the
court would consider affidavits of testimony beyond what
was included in the return).

Moreover, early practice showed that common-law ha-
beas courts routinely held proceedings to determine
whether detainees should be discharged immediately or
whether the state could subject them to further proceed-
ings, including trial in compliance with proper procedures.
See *Ex parte Bollman*, 4 Cranch 75, 125 (1807) (taking tes-
timony in conjunction with an "inquiry" to determine
whether "the accused shall be discharged or held to trial").
In *Ex parte Kaine*, 14 F. Cas. 78 (No. 7,597) (CC SDNY
1853), for example, a federal court analyzed whether a pe-
titioner, who had been found guilty of an offense by a com-
missioner, was subject to extradition. The court passed on
questions of law concerning whether the commissioner had
the power to adjudicate petitioner's criminality. *Id.*, at 80.
Ultimately, the court found that petitioner was "entitled to
be discharged from imprisonment" due to defects in the pro-
ceedings before the commissioner, but entertained further
evidence on whether he could nevertheless be extradited.
*Id.*, at 82. Only after finding no additional evidence that
would permit extradition did the court order release. *Ibid.*

Similarly, in *Coleman* v. *Tennessee,* 97 U. S. 509 (1879),
the petitioner had been convicted of a capital offense by a

state court, even though he had committed the offense while a soldier in the United States Army. *Id.*, at 510–511. This Court granted habeas on the grounds that the state-court judgment was void but, because the petitioner had also been found guilty of murder by a military court, never-theless turned the prisoner over to the custody of the mili-tary for appropriate punishment. *Id.*, at 518–520. Not sur-prisingly, then, the Court has found that habeas courts may discharge detainees in a manner that would allow defects in a proceeding below to be corrected. *In re Bonner*, 151 U. S. 242, 261 (1894).

These examples confirm that outright habeas release was not always immediately awarded. But they also show that common-law courts understood that relief short of release, such as ordering officials to comply with the law and to cor-rect underlying errors, nevertheless fell within the scope of a request for habeas corpus.[4]

### 3

Despite exalting the value of pre-1789 precedent, the Court's key rationale for why respondent does not seek "re-lease" in the so-called traditional sense rests on an inappo-site, contemporary case: *Munaf* v. *Geren*, 553 U. S. 674 (2008).[5] *Ante*, at 14. *Munaf*, the Court claims, shows that

———————

[4] The Court considers irrelevant cases demonstrating that the execu-tive was permitted to cure defects in detention because "the legality of [respondent's] detention is not in question" here. *Ante,* at 17; see also *ante,* at 32–33 (acknowledging that it is "often 'appropriate' to allow the executive to cure defects in a detention" in habeas cases (quoting *Boumediene*, 553 U. S., at 779)). But as explained in Part I–A, *supra*, that is exactly what respondent questions by arguing that his detention violated governing asylum law.

[5] Oddly, the Court embraces *Munaf*—a recent decision involving de-tainees held outside the territorial limits of the United States who were subject to prosecution by a foreign sovereign—to support its conclusion about the availability of habeas review. Yet at the same time, it dis-misses respondent's reliance on *Boumediene* v. *Bush*, 553 U. S. 723 (2008), outright on the grounds that the case is "not about immigration

habeas is not available to seek an order to be brought into this country. *Ante*, at 14. But that case is in a category of its own and has no bearing on respondent's claims here. *Munaf* addressed a one-of-a-kind scenario involving the transfer of individuals between different sovereigns. There, two United States citizens in Iraq filed habeas petitions seeking to block their transfer to Iraqi authorities after being accused of committing crimes and detained by American-led coalition forces pending investigation and prosecution in Iraqi courts. 553 U. S., at 679–680, 692. The central question, this Court repeatedly stated, was "whether United States district courts may exercise their habeas jurisdiction to enjoin our Armed Forces from transferring individuals detained within another sovereign's territory to that sovereign's government for criminal prosecution." *Id.*, at 689; see also *id.*, at 704.

In concluding that habeas did not extend to the relief sought by the citizens detained in Iraq, the *Munaf* Court relied on cases involving habeas petitions filed to avoid extradition. *Id.*, at 695–696 (citing *Wilson* v. *Girard*, 354 U. S. 524 (1957) (*per curiam*), and *Neely* v. *Henkel*, 180 U. S. 109 (1901)). These decisions, the Court concluded, established that American courts lack habeas jurisdiction to enjoin an extradition or similar transfer to a foreign sovereign exercising a right to prosecution. 553 U. S., at 696–697. These circumstances, which today's Court overlooks, mean that *Munaf* is more like the extradition cases that the Court deems not "pertinent." *Ante,* at 20.[6]

––––––––
at all." *Ante*, at 32.

  [6] Nor is the Court correct in dismissing common-law extradition precedents as inapposite because they show "nothing more than the use of habeas to secure release from custody." *Ante*, at 21. Indeed, these extradition cases demonstrate that the common-law writ encompassed exactly the kind of permission to remain in a country that the Court claims falls outside its scope. *Ante*, at 12, 14. *In re Stupp,* 23 F. Cas. 296 (No. 13,563) (CC SDNY 1875), which the Court cites in passing, emphatically affirmed that habeas corpus was available to challenge detention pending

In any event, respondent is not similarly situated to the petitioners in *Munaf*, who sought habeas to thwart removal from the United States in the face of a competing sovereign's interests. Mindful that the case implicated "sensitive foreign policy issues in the context of ongoing military operations," the *Munaf* Court observed that granting habeas relief would "interfere with Iraq's sovereign right to punish offenses against its laws committed within its borders." 553 U. S., at 692 (internal quotation marks omitted); see also *id.*, at 689, 694, 700. For that reason, it proceeded "'with the circumspection appropriate when this Court is adjudicating issues inevitably entangled in the conduct of . . . international relations.'" *Id.*, at 689, 692. Here, of course, no foreign sovereign is exercising a similar claim to custody over respondent during an ongoing conflict that would trigger the comity concerns that animated *Munaf*.

––––––––––

extradition: "[T]he great purposes of the writ of habeas corpus can be maintained, as they must be. The court issuing the writ must inquire and adjudge whether the commissioner acquired jurisdiction . . . and had before him legal and competent evidence of facts whereon to pass judgment as to the fact of criminality, and did not arbitrarily commit the accused for surrender." *Id.*, at 303. Although the *Stupp* court did not ultimately issue the writ, other courts have. See, *e.g.*, *Ex parte Kaine*, 14 F. Cas. 78, 82 (No. 7,597) (CC SDNY 1853) (granting the writ to a prisoner whose detention was "in consequence of illegality in the proceedings under the [extradition] treaty"); *Pettit* v. *Walshe*, 194 U. S. 205, 219–220 (1904) (affirming a grant of habeas where a prisoner's detention violated the terms of an extradition treaty with Great Britain); *In re Washburn*, 4 Johns. Ch. 106, 114 (N. Y. 1819) (granting a habeas petition of a noncitizen after a request for extradition); *People* v. *Goodhue*, 2 Johns. Ch. 198, 200 (N. Y. 1816) (releasing prisoner subject to possible interstate extradition). These extradition-related habeas cases show that the writ was undoubtedly used to grant release in the very direction—that is, away from a foreign country and into the United States—that the Court today derides. Indeed, the same scholar the Court cites makes the point that extradition specifically allowed courts to hear challenges to the Executive's ability to "detain aliens for removal to another country at the request of [the] government." Neuman, Habeas Corpus, Executive Detention, and the Removal of Aliens, 98 Colum. L. Rev. 961, 1003 (1998).

## C

Next, the Court casually dismisses nearly 70 years of precedent from the finality era, the most relevant historic period for examining judicial review of immigration decisions. It concludes that, in case after case, this Court exercised habeas review over legal questions arising in immigration cases akin to those at issue here, not because the Constitution required it but only because a statute permitted it. *Ante*, at 23–24. That conclusion is both wrong in its own right and repeats arguments this Court rejected a half century ago when reviewing this same body of cases.

At the turn of the 20th century, immigration to the United States was relatively unrestricted. Public sentiment, however, grew hostile toward many recent entrants, particularly migrant laborers from China. In response, Congress enacted the so-called Chinese Exclusion Act of 1882, ch. 126, 22 Stat. 58, which prohibited the entry of Chinese laborers to the United States. The Scott Act, ch. 1064, 25 Stat. 504, enacted in 1888, forbade reentry of Chinese laborers who had left after previously residing in this country. Although immigration officials routinely denied entry to arriving migrants on the basis of these laws, many of these decisions were overturned by federal courts on habeas review. See, *e.g.*, *United States* v. *Jung Ah Lung*, 124 U. S. 621 (1888).

This did not escape Congress' attention. See Select Committee on Immigration & Naturalization, H. R. Rep. No. 4048, 51st Cong., 2d Sess., 273–275 (1891) (documenting rate of reversal of immigration exclusion orders by Federal District Court in San Francisco). Congress responded by enacting the Immigration Act of 1891, which stripped federal courts of their power to review immigration denials: "All decisions made by the inspection officers or their assistants touching the right of any alien to land, when adverse to such right, shall be final unless appeal be taken to the

superintendent of immigration, whose action shall be subject to review by the Secretary of the Treasury." Act of Mar. 3, 1891, §8, 26 Stat. 1085. By its terms, that restriction on federal judicial power was not limited to review of some undefined subset of issues, such as questions of law or fact; it made executive immigration decisions final in all respects.

The Court, however, quickly construed the statute in *Nishimura Ekiu* v. *United States*, 142 U. S. 651 (1892) (*Ekiu*), to preclude only review of executive factfinding. Having so construed the statute, the Court in *Ekiu*, and in case after case following *Ekiu*, recognized the availability of habeas to review a range of legal and constitutional questions arising in immigration decisions. The crucial question here is whether the finality-era Courts adopted that construction of jurisdiction-stripping statutes because it was simply the correct interpretation of the statute's terms and nothing more or because that construction was constitutionally compelled to ensure the availability of habeas review. The better view is that *Ekiu*'s construction of the 1891 statute was constitutionally compelled.

In *Ekiu*, the Court recognized that a Japanese national was entitled to seek a writ of habeas corpus to review an exclusion decision issued almost immediately upon her arrival to the United States. As the Court notes, *ante*, at 26, the relevant issue in that case was whether the 1891 Act, "if construed as vesting . . . exclusive authority" in the Executive to determine a noncitizen's right to enter the United States, violated petitioner's constitutional "right to the writ of *habeas corpus*, which carried with it the right to a determination by the court as to the legality of her detention," 142 U. S., at 656 (statement of the case). That is, the *Ekiu* Court confronted whether construing the 1891 Act as precluding all judicial review of immigration decisions like the exclusion order at issue would violate the constitutional guarantee to habeas.

The Court answered that question by construing the 1891

Act as precluding judicial review only of questions of fact.
"An alien immigrant," the Court first held, who is "pre-
vented from landing [in the United States] by any [execu-
tive] officer . . . and thereby restrained of his liberty, is
doubtless entitled to a writ of *habeas corpus* to ascertain
whether the restraint is lawful." *Id.*, at 660. The Court
then explained that it had authority to hear the case (de-
spite Congress' clear elimination of judicial review) because
it interpreted the 1891 Act as meaning only that an immi-
gration official's determination of "facts" was final and un-
reviewable. *Ibid.* (explaining that Congress could entrust
the final determination of facts to executive officers).

   After so articulating the 1891 Act's limits on judicial re-
view, the Court analyzed two challenges to the integrity of
the proceedings, neither of which raised questions of histor-
ical fact. See *id.*, at 662–663 (considering whether immi-
gration officer's appointment was unconstitutional such
that his actions were invalid); *id.*, at 663 (determining
whether proceedings were unlawful because the officer
failed to take sworn testimony or make a record of the deci-
sion).[7] Although the Court ultimately concluded that those
legal and constitutional challenges lacked merit, *id.*, at
662–664, what matters is that the Court evaluated the ar-
guments and recognized them as possible grounds for ha-
beas relief.

   What, then, can *Ekiu* tell us? Today's Court finds signif-
icant that the brief opinion makes no explicit mention of the
Suspension Clause. *Ante*, at 28. This omission, it con-
cludes, can only mean that the *Ekiu* Court did not think
that (or had no occasion to consider whether) the Suspen-
sion Clause "imposed any limitations on the authority of
Congress to restrict the issuance of writs of habeas corpus

_____

   [7] These claims are uncannily reminiscent of the kinds of claims re-
spondent advances here. See Parts II–A and II–B, *supra.*

in immigration matters." *Ante*, at 27. According to this theory, *Ekiu* concluded that the plain terms of the1891 Act prohibited judicial review of executive factfinding alone, and nothing more can be said.

But this myopic interpretation ignores many salient facts. To start, the 1891 Act was enacted for the purpose of limiting all judicial review of immigration decisions, not just a subset of factual issues that may arise in those decisions. Further, the plain terms of the statute did not cabin the limitation on judicial review to historical facts found by an immigration officer. *Ekiu*, moreover, evaluated the Act's constitutionality in view of the petitioner's argument that the limitation on judicial review violated the constitutional "right to the writ of *habeas corpu*s." 142 U. S., at 656 (statement of the case). These considerations all point in one direction: Even if the *Ekiu* Court did not explicitly hold that the Suspension Clause prohibits Congress from broadly limiting all judicial review in immigration proceedings, it certainly decided the case in a manner that avoided raising this constitutional question. Indeed, faced with a jurisdiction-stripping statute, the only review left for the *Ekiu* Court was that required by the Constitution and, by extension, protected by the guarantee of habeas corpus.

The Court also maintains that *Ekiu* concluded that "'the act of 1891 is constitutional'" in full, not "only in part." *Ante*, at 27 (quoting *Ekiu*, 142 U. S., at 664). Yet as the Court acknowledges, it was only "after interpreting the 1891 Act" as precluding judicial review of questions of fact alone that the *Ekiu* Court deemed it constitutional. *Ante*, at 26; see also *Ekiu*, 142 U. S., at 664 (concluding that "[t]he result" of its construction is that the 1891 Act "is constitutional"). That cannot mean that *Ekiu* found the 1891 Act constitutional even to the extent that it prevented all judicial review of immigration decisions, even those brought on habeas. What it can only mean, instead, is that *Ekiu*'s con-

struction of the 1891 Act was an answer to the constitu-
tional question posed by the case: whether and to what ex-
tent denying judicial review under the 1891 Act would vio-
late the constitutional "right to the writ of *habeas corpus*."
142 U. S., at 656 (statement of the case).[8]

Bolstering this interpretation is that the Court has re-
peatedly reached the same result when interpreting subse-
quent statutes purporting to strip federal courts of all juris-
diction over immigration decisions. In *Gegiow* v. *Uhl*, 239
U. S. 3 (1915), for example, the Court observed that *Ekiu*
decided that "[t]he conclusiveness of the decisions of immi-
gration officers under [the 1891 Act]" referred only to "con-
clusiveness upon matters of fact." 239 U. S., at 9. It relied
heavily on *Ekiu* to support its determination that the Im-
migration Act of 1907, 34 Stat. 898, which also rendered
decisions of immigration officers to be "final," §25, *id.*, at
907, similarly only barred judicial review of questions of
fact, 239 U. S., at 9. Indeed, time and again, against a back-
drop of statutes purporting to bar all judicial review of ex-
ecutive immigration decisions, this Court has entertained
habeas petitions raising a host of issues other than historic
facts found by immigration authorities.[9]

––––––––––

[8] The Court also claims that because *Ekiu* stated that the 1891 Act was
constitutional, respondent must be wrong that *Ekiu* found the 1891 Act
"unconstitutional in most of its applications (*i.e.*, to all questions other
than questions of fact)." *Ante*, at 27. But the point here is not that *Ekiu*
actually found the 1891 Act unconstitutional in part; it is that *Ekiu* in-
terpreted the 1891 Act to avoid rendering it unconstitutional in part.

[9] See, *e.g.*, *The Japanese Immigrant Case*, 189 U. S. 86 (1903) (habeas
petition filed by noncitizen alleged to have entered unlawfully and ap-
prehended four days after being let on shore); *Gonzales* v. *Williams*, 192
U. S. 1 (1904) (habeas petition filed by resident of Puerto Rico detained
at the port, who claimed that Puerto Rican nationals are United States
citizens allowed to enter the mainland as a matter of course); *United
States ex rel. Turner* v. *Williams*, 194 U. S. 279 (1904) (habeas petition
by noncitizen found within the United States 10 days after entry alleging
his arrest was unconstitutional); *Chin Yow* v. *United States*, 208 U. S. 8
(1908) (habeas petition filed by a Chinese individual with a claim of U. S.

To be sure, this entrenched line of cases does not directly state that habeas review of immigration decisions is constitutionally compelled. But an alternate understanding of those cases rests on an assumption that is farfetched at best: that, year after year, and in case after case, this Court simply ignored the unambiguous texts of the serial Immigration Acts limiting judicial review altogether. The Court's pattern of hearing habeas cases despite those statutes' contrary mandate reflects that the Court understood habeas review in those cases as not statutorily permitted but constitutionally compelled.

In any event, we need not speculate now about whether the *Ekiu* Court, or the Courts that followed, had the constitutional right to habeas corpus in mind when they interpreted jurisdiction-stripping statutes only to preclude review of historic facts. This Court has already identified which view is correct. In *Heikkila* v. *Barber*, 345 U. S. 229 (1953), the Court explained that *Ekiu* and its progeny had, in fact, construed the finality statutes to avoid serious constitutional questions about Congress' ability to strip federal courts of their habeas power. As *Heikkila* reiterated, the key question in *Ekiu* (and in later cases analyzing finality statutes) was the extent to which the Constitution allowed Congress to make administrative decisions unreviewable. 345 U. S., at 234. And it concluded that the jurisdiction-stripping immigration statute in that case, a successor to

––––––––––

citizenship who was detained on a steamship and prohibited from disembarking); *Yee Won* v. *White*, 256 U. S. 399 (1921) (habeas petition filed on behalf of noncitizen wife and child denied admission to the United States upon arrival despite claiming legal right to join a family member residing in the country); *Tod* v. *Waldman*, 266 U. S. 113 (1924) (habeas petition by family fleeing religious persecution in Russia denied entry on the grounds that they were likely to become a public charge); *United States ex rel. Polymeris* v. *Trudell*, 284 U. S. 279 (1932) (habeas petition filed by residents of Greek ancestry who left the United States and sought reentry after a lengthy trip abroad).

the 1891 Act, "preclud[ed] judicial intervention in deporta-
tion cases except insofar as it was required by the Consti-
tution." *Id.*, at 234–235.

*Heikkila* thus settles the matter; during the finality era,
this Court either believed that the Constitution required ju-
dicial review on habeas of constitutional and legal questions
arising in immigration decisions or, at the very least,
thought that there was a serious question about whether
the Constitution so required. Although the Court tries to
minimize that conclusion as not dispositive of the question
presented, *ante,* at 29, such a conclusion undoubtedly
weighs against finding §1252(e)(2) constitutional in spite of
its broad prohibition on reviewing constitutional and legal
questions.

The Court dismisses *Heikkila* and its explanation of the
finality-era cases outright. It fixates on the fact that *Heik-
kila* was not itself a habeas case and instead analyzed
whether judicial review of immigration orders was availa-
ble under the Administrative Procedure Act (APA). *Ante*,
at 31–32. *Heikkila*'s discussion of the APA does not detract
from its affirmation that when the language of a jurisdic-
tion-stripping statute precludes all judicial review, the only
review that is left is that required by the constitutional
guarantee of habeas corpus. 345 U. S., at 235.[10] Most im-
portantly, *Heikkila* concluded that APA review was not
equivalent to that judicial review. Second, the Court also

––––––––

[10] Indeed, the Government itself embraced that position in a brief to
the Court during that time. Brief for Respondent in *Martinez* v. *Neelly*,
O. T. 1952, No. 218, p. 19 ("The clear purpose of this [finality] provision
was to preclude judicial review of the Attorney General's decisions in al-
ien deportation cases insofar as the Congress could do so under the Con-
stitution"); *id.*, at 33 ("[T]he courts have long recognized" the finality pro-
visions "restric[t] review of deportation orders as far as the Constitution
permits"); see also *id.*, at 18 (explaining that the finality provisions "pre-
cluded judicial review of deportation orders except for the collateral re-
view in habeas corpus which the Constitution prescribes in cases of per-
sonal detention").

states that *Heikkila* never interpreted *Ekiu* as having found
the 1891 Act "partly unconstitutional." *Ante*, at 32. But
there was no need for the *Ekiu* Court to find the 1891 Act
unconstitutional in part to construe it as prohibiting only
review of historic facts. Instead, as *Heikkila* explained,
*Ekiu* reached its decision by exercising constitutional avoid-
ance.

By disregarding *Heikkila*, the Court ignores principles of
*stare decisis* to stir up a settled debate. Cf. *Ramos* v. *Loui-
siana*, 590 U. S. \_\_\_, \_\_\_, \_\_\_ (2020) (ALITO, J., dissenting)
(slip op., at 1, 12). Perhaps its view is tinted by the fact that
it doubts the Suspension Clause could limit Congress' abil-
ity to eliminate habeas jurisdiction at all. The Court scoffs
at the notion that a limitation on judicial review would have
been understood as an unconstitutional suspension of ha-
beas, noting and distinguishing the limited number of occa-
sions that this Court has found a suspension of the writ of
habeas corpus. See *ante*, at 28–29; but see *ante*, at 7, n. 4
(THOMAS, J., concurring) (noting that historically, suspen-
sions of habeas did not necessarily mention the availability
of the writ). The references to those major historic mo-
ments where this Court has identified a suspension only es-
tablish the outer bounds of Congress' suspension powers; it
says nothing about whether, and to what extent, more lim-
ited restrictions on judicial review might also be found un-
constitutional.

Indeed, the Court acknowledges that some thought it an
open question during the finality era whether the Suspen-
sion Clause imposes limits on Congress' ability to limit ju-
dicial review. See *ante*, at 31, n. 25 (quoting Justice
Brewer's concurring opinion in *United States ex rel. Turner*
v. *Williams*, 194 U. S. 279, 295 (1904), raising the question).
That this question remained unsettled, see n. 1, *supra*, suf-
fices to support the Court's conclusion in *Heikkila*: The fi-
nality-era Courts endeavored to construe jurisdiction-strip-
ping statutes to avoid serious constitutional questions

about the extent of congressional power to limit judicial re-
view.

At bottom, the better view of the finality-era cases is that
they understood the habeas right they sustained to be, or at
least likely to be, constitutionally compelled.  Certainly the
cases do not establish the Court's simplistic view to the con-
trary: That the finality-era Court entertained habeas peti-
tions only because no statute limited its ability to do so, and
no Constitutional provision required otherwise.  That read-
ing of precedent disregards significant indications that this
Court persistently construed immigration statutes strip-
ping courts of judicial review to avoid depriving noncitizens
of constitutional habeas guarantees.  Ignoring how past
courts wrestled with this issue may make it easier for the
Court to announce that there is no unconstitutional suspen-
sion today.  But by sweeping aside most of our immigration
history in service of its conclusion, the Court reopens a
question that this Court put to rest decades ago, and now
decides it differently.  The cost of doing so is enormous.  The
Court, on its own volition, limits a constitutional protection
so respected by our Founding Fathers that they forbade its
suspension except in the direst of circumstances.

D

Not only does the Court cast to one side our finality-era
jurisprudence, it skims over recent habeas precedent.  Per-
haps that is because these cases undermine today's deci-
sion.  Indeed, both *INS* v. *St. Cyr*, 533 U. S. 289 (2001), and
*Boumediene* v. *Bush*, 553 U. S. 723 (2008), instruct that
eliminating judicial review of legal and constitutional ques-
tions associated with executive detention, like the expe-
dited-removal statute at issue here does, is unconstitu-
tional.

The Court acknowledges *St. Cyr*'s holding but does not
heed it.  *St. Cyr* concluded that "'[b]ecause of [the Suspen-
sion] Clause some "judicial intervention in deportation

cases" is unquestionably "required by the Constitution."'"
*Ante*, at 33 (quoting 533 U. S., at 300). This statement af-
firms what the finality-era cases long suggested: that the
Suspension Clause limits Congress' power to restrict judi-
cial review in immigration cases. Nor did *St. Cyr* arrive at
this conclusion simply based on canons of statutory con-
struction. The Court spoke of deeper historical principles,
affirming repeatedly that "[a]t its historical core, the writ of
habeas corpus has served as a means of reviewing the le-
gality of Executive detention, and it is in that context that
its protections have been strongest." *Id.*, at 301; see also
*id.*, at 305 ("The writ of habeas corpus has always been
available to review the legality of Executive detention").
The Court looked to founding era cases to establish that the
scope of this guarantee extended to both the "interpreta-
tion" and "application" of governing law, including law that
guided the exercise of executive discretion. *Id.*, at 302.

Based on that history, the Court also concluded that "a
serious Suspension Clause issue would be presented" by
precluding habeas review in the removal context, *id.*, at
305, even where there was "no dispute" that the Govern-
ment had the legal authority to detain a noncitizen like St.
Cyr, *id.*, at 303. Thus based on the same principles that the
Court purports to apply in this case, the *St. Cyr* Court
reached the opposite conclusion: The Suspension Clause
likely prevents Congress from eliminating judicial review of
discretionary executive action in the deportation context,
even when the writ is used to challenge more than the fact
of detention itself.

*Boumediene* reprised many of the rules articulated in *St.
Cyr*. It first confirmed that the Suspension Clause applied
to detainees held at Guantanamo Bay, repeating the "un-
controversial" proposition that "the privilege of habeas cor-
pus entitles" an executive detainee to a "meaningful oppor-
tunity to demonstrate that he is being held pursuant to 'the
erroneous application or interpretation' of relevant law."

553 U. S., at 779 (quoting *St. Cyr*, 533 U. S., at 302).  Then
the Court detailed the writ's remedial scope.  It affirmed
that one of the "easily identified attributes of any constitu-
tionally adequate habeas corpus proceeding" is that "the ha-
beas court must have the power to order the conditional re-
lease of an individual unlawfully detained."  553 U. S., at
779.  Notably, the Court explained that release "need not be
the exclusive remedy," reasoning that "common-law habeas
corpus was, above all, an adaptable remedy" whose "precise
application and scope changed depending upon the circum-
stances."  *Ibid.* (citing 3 W. Blackstone, Commentaries
*131).  The Court noted that any habeas remedy might be
tempered based on the traditional test for procedural ade-
quacy in the due process context and thus could accommo-
date the "rigor of any earlier proceedings."  553 U. S., at 781
(citing *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976)).

The Court discounts these cases because it objects to the
perceived direction of respondent's requested release.  *Ante*,
at 32 (explaining that *Boumediene* did not suggest that the
enemy combatant petitioners were entitled to enter the
United States upon release).  It similarly contends that re-
spondent's attempted use of the writ is "very different" from
that at issue in *St. Cyr.  Ante*, at 33.

Neither rejoinder is sound.  *St. Cyr* and *Boumediene* con-
firm that at minimum, the historic scope of the habeas
power guaranteed judicial review of constitutional and le-
gal challenges to executive action.  They do not require re-
lease as an exclusive remedy, let alone a particular direc-
tion of release.  Rather, both cases built on the legacy of the
finality era where the Court, concerned about the constitu-
tionality of limiting judicial review, unquestionably enter-
tained habeas petitions from arriving migrants who raised
the same types of questions respondent poses here.  See,
*e.g., St. Cyr*, 533 U. S., at 307 (citing *United States ex rel.
Accardi* v. *Shaughnessy*, 347 U. S. 260 (1954) (habeas case

attacking the denial of an application for suspension of deportation); see also *id.*, at 268 ("[W]e object to the Board's alleged failure to exercise its own discretion, contrary to existing valid regulations" (emphasis deleted))).

As discussed above, respondent requests review of immigration officials' allegedly unlawful interpretation of governing asylum law, and seeks to test the constitutional adequacy of expedited removal procedures. As a remedy, he requests procedures affording a conditional release, but certainly did not so limit his prayer for relief. His constitutional and legal challenges fall within the heartland of what *St. Cyr* said the common-law writ encompassed, and *Boumediene* confirms he is entitled to additional procedures as a form of conditional habeas relief. These precedents themselves resolve this case.

\*	\*	\*

The Court wrongly declares that §1252(e)(2) can preclude habeas review of respondent's constitutional and legal challenges to his asylum proceedings. So too the Court errs in concluding that Congress need not provide a substitute mechanism to supply that review. In so holding, the Court manages to flout precedents governing habeas jurisprudence from three separate eras. Each one shows that respondent is entitled to judicial review of his constitutional and legal claims. Because §1252(e)(2) excludes his challenges from habeas proceedings, and because the INA does not otherwise provide for meaningful judicial review of the Executive's removal determination, respondent has no effective means of vindicating his right to habeas relief. Quite simply, the Constitution requires more.

## III

Although the Court concludes that habeas relief is not available because of the particular kind of release that it

thinks respondent requests, it also suggests that respond-
ent's unlawful status independently prohibits him from
challenging the constitutionality of the expedited removal
proceedings.  By determining that respondent, a recent un-
lawful entrant who was apprehended close in time and
place to his unauthorized border crossing, has no proce-
dural due process rights to vindicate through his habeas
challenge, the Court unnecessarily addresses a constitu-
tional question in a manner contrary to the text of the Con-
stitution and to our precedents.

The Court stretches to reach the issue whether a nonciti-
zen like respondent is entitled to due process protections
in relation to removal proceedings, which the court below
mentioned only in a footnote and as an aside.  See *ante*, at
34 (quoting 917 F. 3d, at 1111, n. 15).  In so doing, the Court
opines on a matter neither necessary to its holding nor se-
riously in dispute below.[11]

The Court is no more correct on the merits.  To be sure,
our cases have long held that foreigners who had never
come into the United States—those "on the threshold of in-
itial entry"—are not entitled to any due process with re-
spect to their admission.  *Shaughnessy* v. *United States ex
rel. Mezei*, 345 U. S. 206, 212 (1953) (citing *Ekiu*, 142 U. S.,
at 660); see also *Landon* v. *Plasencia*, 459 U. S. 21, 32
(1982).  That follows from this Courts' holdings that the po-
litical branches of Government have "plenary" sovereign
power over regulating the admission of noncitizens to the
United States.  *Ante*, at 35; see also *Ekiu*, 142 U. S., at 659.

—————————

[11] While the Court contends that the writ of habeas corpus does not
allow an individual to "obtain administrative review" or additional pro-
cedures, it arrives at this conclusion only in the context of discussing
what sorts of "relief" properly qualified as release from custody at com-
mon law.  *Ante*, at 2, 14–16 (contrasting request for additional remedies
with a "simple" release from custody).  To the extent that this discussion
necessarily prohibits federal courts from entertaining habeas petitions
alleging due process violations in expedited removal proceedings, the
Court's separate discussion in Part IV is unnecessary.

Noncitizens in this country, however, undeniably have due process rights. In *Yick Wo* v. *Hopkins*, 118 U. S. 356 (1886), the Court explained that "[t]he Fourteenth Amendment to the Constitution is not confined to the protection of citizens" but rather applies "to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality." *Id.*, at 369; *Zadvydas* v. *Davis*, 533 U. S. 678, 693 (2001) (reiterating that "once an alien enters the country," he is entitled to due process in his removal proceedings because "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent").

In its early cases, the Court speculated whether a noncitizen could invoke due process protections when he entered the country without permission or had resided here for too brief a period to "have become, in any real sense, a part of our population." *The Japanese Immigrant Case*, 189 U. S. 86, 100 (1903); see also *ante*, at 34 (quoting *Ekiu*, 142 U. S., at 660 (remarking that for those not "'admitted into the country pursuant to law,'" the procedures afforded by the political branches are all that are due)). But the Court has since determined that presence in the country is the touchstone for at least some level of due process protections. See *Mezei*, 345 U. S., at 212 (explaining that "aliens who have once passed through our gates, even illegally," possess constitutional rights); *Mathews* v. *Diaz*, 426 U. S. 67, 77 (1976) ("There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment . . . protects every one of these persons . . . . Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection"). As a noncitizen within the territory of the United States, respondent is entitled to invoke the protections of the Due Process Clause.

In order to reach a contrary conclusion, the Court assumes that those who do not enter the country legally have

the same due process rights as those who do not enter the
country at all.  The Court deems that respondent possesses
only the rights of noncitizens on the "threshold of initial en-
try," skirting binding precedent by assuming that individu-
als like respondent have "'assimilated to [the] status'" of an
arriving noncitizen for purposes of the constitutional anal-
ysis.  *Mezei*, 345 U. S., at 212, 214.  But that relies on a legal
fiction.  Respondent, of course, was actually within the ter-
ritorial limits of the United States.

More broadly, by drawing the line for due process at legal
admission rather than physical entry, the Court tethers
constitutional protections to a noncitizen's legal status as
determined under contemporary asylum and immigration
law.  But the Fifth Amendment, which of course long pre-
dated any admissions program, does not contain limits
based on immigration status or duration in the country: It
applies to "persons" without qualification.  *Yick Wo*, 118
U. S., at 369.  The Court has repeatedly affirmed as much
long after Congress began regulating entry to the country.
*Mathews*, 426 U. S., at 77; *Zadvydas*, 533 U. S., at 693–694.
The Court lacks any textual basis to craft an exception to
this rule, let alone one hinging on dynamic immigration
laws that may be amended at any time, to redefine when an
"entry" occurs.  Fundamentally, it is out of step with how
this Court has conceived the scope of the Due Process
Clause for over a century: Congressional policy in the im-
migration context does not dictate the scope of the Consti-
tution.

In addition to creating an atextual gap in the Constitu-
tion's coverage, the Court's rule lacks any limiting princi-
ple.  This is not because our case law does not supply one.
After all, this Court has long affirmed that noncitizens have
due process protections in proceedings to remove them from
the country once they have entered.  See *id.*, at 693–694;
*Mezei*, 345 U. S., at 212.

Perhaps recognizing the tension between its opinion today and those cases, the Court cabins its holding to individuals who are "in respondent's position." *Ante*, at 36. Presumably the rule applies to—and only to—individuals found within 25 feet of the border who have entered within the past 24 hours of their apprehension. Where its logic must stop, however, is hard to say. Taken to its extreme, a rule conditioning due process rights on lawful entry would permit Congress to constitutionally eliminate all procedural protections for any noncitizen the Government deems unlawfully admitted and summarily deport them no matter how many decades they have lived here, how settled and integrated they are in their communities, or how many members of their family are U. S. citizens or residents.

This judicially fashioned line-drawing is not administrable, threatens to create arbitrary divisions between noncitizens in this country subject to removal proceedings, and, most important, lacks any basis in the Constitution. Both the Constitution and this Court's cases plainly guarantee due process protections to all "persons" regardless of their immigration status, a guarantee independent of the whims of the political branches. This contrary proclamation by the Court unnecessarily decides a constitutional question in a manner contrary to governing law.[12]

## IV

The Court reaches its decision only by downplaying the

---

[12] The Court notes that noncitizens like respondent seeking legal admission lack due process rights "'regarding [their] application.'" *Ante*, at 34 (quoting *Landon* v. *Plasencia*, 459 U. S. 21, 32 (1982)). It does not, however, explain what kinds of challenges are related to one's application and what kinds are not. Presumably a challenge to the length or conditions of confinement pending a hearing before an immigration judge falls outside that class of cases. Because respondent only sought promised asylum procedures, however, today's decision can extend no further than these claims for relief.

nature of respondent's claims, ignoring a plethora of com-
mon-law immigration cases from a time of relatively open
borders, and mischaracterizing the most relevant prece-
dents from this Court.  Perhaps to shore up this unstable
foundation, the Court justifies its decision by pointing to
perceived vulnerabilities and abuses in the asylum system.
I address the Court's policy concerns briefly.

    In some ways, this country's asylum laws have repre-
sented the best of our Nation.  Unrestricted migration at
the founding and later, formal asylum statutes, have served
as a beacon to the world, broadcasting the vitality of our
institutions and our collective potential.  For many who
come here fleeing religious, political, or ideological persecu-
tion, and for many more who have preceded them, asylum
has provided both a form of shelter and a start to a better
life.  That is not to say that this country's asylum policy has
always, or ever, had overwhelming support.  Indeed, many
times in our past, particularly when the Nation's future has
appeared uncertain or bleak, members of this country have
sought to close our borders rather than open them.  See S.
Legomsky & C. Rodriguez, Immigration and Refugee Law
and Policy 875–876 (5th ed. 2009) (explaining that restric-
tionist sentiments in the 1930s were fueled in part by the
Great Depression).  Yet this country has time and again re-
affirmed its commitment to providing sanctuary to those es-
caping oppression and persecution.  Congress and the Ex-
ecutive have repeatedly affirmed that choice in response to
serial waves of migration from other countries by enacting
and amending asylum laws and regulations.  In fact, a cen-
terpiece of respondent's claim is that officials were not fol-
lowing these statutorily enacted procedures.

    The volume of asylum claims submitted, pending, and
granted has varied over the years, due to factors like chang-
ing international migration patterns, the level of resources
devoted to processing and adjudicating asylum applica-
tions, and amendments to governing immigration laws.  See

Congressional Research Service, Immigration: U. S. Asylum Policy 25 (Feb. 19, 2019); see also Dept. of Homeland Security, Office of Immigration Statistics, 2018 Yearbook of Immigration Statistics 43 (2019) (Table 16) ("Individuals Granted Asylum Affirmatively or Defensively: Fiscal Years 1990 to 2018" (quotation modified)).  For the past few years, both new asylum applications and pending applications have steadily increased.  Immigration: U. S. Asylum Policy, at 25.

It is universally acknowledged that the asylum regime is under strain.  It is also clear that, while the reasons for the large pending caseload are complicated,[13] delays in adjudications are undesirable for a number of reasons.  At bottom, when asylum claims are not resolved in a timely fashion, the protracted decisionmaking harms those eligible for protection and undermines the integrity of the regime as a whole.  D. Meissner, F. Hipsman, & T. Aleinikoff, Migration Policy Institute, The U. S. Asylum System in Crisis: Charting a Way Forward 4 (Sept. 2018).

But the political branches have numerous tools at their disposal to reform the asylum system, and debates over the best methods of doing so are legion in the Government, in the academy, and in the public sphere.[14]  Congress and the

--------

[13] In 2018 Senate Judiciary Committee hearings, the Director of the Executive Office of Immigration Review identified factors contributing to the backlog of cases, including lengthy hiring times for new immigration judges and the continued use of paper files.  See Testimony of James McHenry, Strengthening and Reforming America's Immigration Court System, Hearings before the Subcommittee on Border Security and Immigration of the Senate Committee on the Judiciary, 115th Cong., 2d Sess., 2 (2018).  The Court, meanwhile, insinuates that much of the burden on the asylum system can be attributed to frivolous or fraudulent asylum claims.  See, *e.g.*, *ante*, at 1, 7–8, nn. 9 and 10.  But the magnitude of asylum fraud has long been debated.  See S. Legomsky & C. Rodriguez, Immigration and Refugee Law and Policy 1034 (5th ed. 2009); Immigration: U. S. Asylum Policy, at 28.

[14] See, *e.g.,* GAO, Immigration Courts: Actions Needed To Reduce Case Backlog and Address Long-Standing Management and Operational

Executive are thus well equipped to enact a range of measures to reform asylum in a number of ways and routinely do so.[15]  Indeed, as the Court notes, the expedited removal process at issue here was created by law as one such measure to ease pressures on the immigration system. *Ante,* at 4.

In the face of these policy choices, the role of the Judiciary is minimal, yet crucial: to ensure that laws passed by Congress are consistent with the limits of the Constitution.  The Court today ignores its obligation, going out of its way to restrict the scope of the Great Writ and the reach of the Due Process Clause.  This may accommodate congressional policy concerns by easing the burdens under which the immigration system currently labors.  But it is nothing short of a self-imposed injury to the Judiciary, to the separation of powers, and to the values embodied in the promise of the Great Writ.

Because I disagree with the Court's interpretation of the reach of our Constitution's protections, I respectfully dissent.

—————

Challenges (GAO–17–438, June 2017); Uchimiya, A Blackstone's Ratio for Asylum: Fighting Fraud While Preserving Procedural Due Process for Asylum Seekers, 26 Pa. St. Int'l L. Rev. 383 (2007); Martin, Reforming Asylum Adjudication: On Navigating the Coast of Bohemia, 138 U. Pa. L. Rev. 1247 (1990).

    [15] P. Alvarez & G. Sands, Trump Administration Proposes Sweeping Changes to U. S. Asylum System in New Rule, CNN, June 10, 2020 (online source archived at www.supremecourt.gov).